**DATALECT COMPUTER SERVICES, LTD., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–328 C.

United States Court of Federal Claims.

Dec. 18, 1997.

Robert B. Breisblatt, Chicago, IL, with whom was Philip Dale Segrest, Jr., for plaintiff.

Brian S. Smith, Washington, DC, with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen and Assistant Director Anthony H. Anikeeff, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge.

This case is before the court on defendant's motion for summary judgment and plaintiff's cross-motion for partial summary judgment, both filed pursuant to Rule 56 of the Court of Federal Claims (RCFC 56). The parties entered into a requirements contract pursuant to which plaintiff provided maintenance and repair services for "tier-III" computer equipment to the United States Army, Europe ("USAREUR"). At issue is whether defendant, through the

USAREUR, breached its duty of care in preparing its estimate of requirements, and whether the government is liable for failing to order all of its actual requirements from plaintiff. The court heard oral argument on the parties' motions on September 17, 1997. For the reasons set forth below, the court grants in part and denies in part defendant's motion for summary judgment as to entitlement and damages, and grants in part and denies in part plaintiff's cross-motion for partial summary judgment as to entitlement.

## BACKGROUND

On July 23, 1992, defendant, through the USAREUR Contracting Center, Fifth Signal Command, issued an invitation for bids ("IFB") for the maintenance and repair of government-owned "tier-III" (freestanding, office-based, personal) computer equipment in Germany, Belgium, the United Kingdom and Italy. On February 5, 1993, USAREUR entered into requirements contract No. DAJA37–93–D–0065 with Datalect Computer Services, Ltd. ("Datalect"), a corporation organized under the laws of the United Kingdom. As a result of being awarded the contract, Datalect established an operation in Germany. Performance of the contract, which incorporated a one year term with three one year options, began in March, 1993. The government exercised all of the options, and performance continued through March, 1997.

### The Contract

The IFB and resulting contract contained a mandatory estimate of the government's requirements for tier-III maintenance and repair. *See* 48 C.F.R. § 16.503(a)(1) (1996) (requiring a statement of estimated needs). In addition, the contract provided that Datalect would be the exclusive contractor for such requirements. The contract stated:

The quantities of supplies or services specified in the Schedule are estimates only

and are not purchased by this contract. Except as this contract may otherwise provide, if the Government's requirements do not result in orders of the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an equitable price adjustment. . . . Except as this contract otherwise provides, the Government shall order from the contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.

(Def.'s App. at 99.)[1] While an equitable adjustment was unavailable under the contract for failure of the government's requirements to meet the estimate, the Statement of Work ("SOW") required Datalect to furnish all labor, materials and facilities to provide demand maintenance on all of the tier-III equipment covered by the contract.

The location of the mandatory estimate in the solicitation and contract is unclear. Defendant contends that "Technical Exhibit 1" was the official "estimate." Technical Exhibit 1 listed the total number of service calls in specific locations to Sorbus GmBH ("Sorbus"), the tier-III maintenance contractor from 1989 to 1993, in fiscal year 1991.[2] Technical Exhibit 1 also listed the manufacturer and model of each piece of equipment serviced, if such information was available. Accompanying the historical workload information provided in Technical Exhibit 1, was an instruction that:

This technical exhibit furnishes data, which in conjunction with the contractor's experience in the trade, should allow the contractor to arrive at an accurate estimate of the workload. The information presented here consists of repair data for FY 91.

(Def.'s App. at 104.) The number of service calls to Sorbus in fiscal year 1991 totaled

---

1. References to the appendices of either defendant's or plaintiff's motion will be cited as "App." When the same material is contained in both parties' appendices, the court will cite to the appendix of defendant, the original moving party. If the materials are only contained in plaintiff's appendix, the court will cite to plaintiff's appendix.

2. The solicitation was issued in mid–1992, and therefore the workload information was only available for fiscal year 1991, and not fiscal year 1992.

16,939, averaging approximately 60–65 calls per business day.

Plaintiff avers that "Section B" of the proposed contract was the official "estimate." Section B contained the specific maintenance/repair functions, or "CLINs," to be performed by the tier-III maintenance contractor. The CLINs were organized by generic types of equipment to be serviced, and were identified by item numbers. Examples of CLINs included "demand maintenance calls per keyboard" and "demand maintenance calls per laser printer/scanner." (Def.'s App. at 197.) The contract provided for bids/payment on a fixed price per call basis for each CLIN. Adjacent to each CLIN was an estimate of the quantity of the service required, a unit of measure, and two lines for the contractor to fill in for its proposed unit price and total price (the estimated quantity multiplied by the unit amount). In preparing the quantity estimate in the CLINs, the contracting officer representative ("COR") at the time the solicitation was compiled, Raymond Selken, consulted records contained in Technical Exhibit 1 and made minor reductions in the number of calls per CLIN in the base contract versus the number of calls per CLIN depicted in the contract option years. For example, Mr. Selken incorporated a 5% reduction from the 1991 workload figures in each of the contract's option years to account for a reduction of requirements as a result of the ending of the Persian Gulf War. Accompanying the itemized list of CLINs was the following statement: "DEMAND MAINTENANCE IN ACCORDANCE WITH THE STATEMENT OF WORK (SOW), ATTACHMENT 1. NOTE: OFFERORS ARE REQUESTED TO PRICE PER DEMAND CALL. QUANTITIES ARE YEARLY ESTIMATES." (*Id.*)

While the location of the official estimate is unclear, both "estimates" described above were based upon the historical workload information in Technical Exhibit 1. In addition, the government submits that in its "estimate" it did not undertake, outside of some minor reductions in requirements, to evaluate or set forth factors that may have affected the number of service calls to the contractor.

### Actual Service Call Rate

Despite the historical workload of 60–65 service calls per business day, the actual service call rate under the Datalect contract fluctuated between approximately 25–45 service calls per day. In a letter to Datalect dated November 22, 1994, James Demetroulis, a contracting officer for the Fifth Signal Command, stated that an approximate 48% decrease in calls had occurred under the Datalect contract. Datalect did not adjust its work force or parts inventory downward when it received fewer service calls than depicted in the solicitation. Beginning approximately 4–6 months into Datalect's performance of the contract, Datalect complained to the contracting officer about the reduced call rate. The government cited as contributing factors the decreased population of Army personnel in Europe since 1991, resulting from the Base Realignment and Closure Act, the reduction in forces or troop strength in USAREUR ("the drawdown"), the purchase of new computers under extended one to five year warranties in the early 1990's, and the turning-in of outdated computer equipment. In its inquiries, Datalect also cited the government's apparent in-house maintenance as a factor contributing to the reduced call rate. The government responded that while in-house maintenance was being performed, the contract did not preclude such activities. In addition, the contracting officer stated that the estimate provided for in the contract was the "most current" at the time of the solicitation.

### In-House Maintenance

During Datalect's contract term, an undetermined amount of maintenance and repair of tier-III computers was performed by Army personnel, in addition to the services performed by Datalect. Such in-house, or self-, maintenance took several forms, including maintenance by information management officers ("IMOs"), who also called on Datalect to repair malfunctioning computers. IMOs were integral to Datalect's demand maintenance function, because the contract allowed either Datalect or the Army (via IMOs) to perform "technical inspections" to evaluate the equipment for "serviceability" and to as-

sign a "condition code" to the computer's malfunction. The function of an IMO, according to defendant, "is to assist other Army personnel in a wide range of computer-related activities including the procurement, set-up, operation, upgrading, maintenance, diagnosis, repair, and disposition of computer equipment." (Def.'s Prop. Findings of Uncontroverted Fact at 12.) Thus, a system was established whereby when an Army computer malfunctioned, the user sought assistance from an IMO, who, if necessary, would contact a government operated "help desk." The help desk would then typically document the call and make a service call to the tier-III contractor. Defendant believes that there were approximately 400–450 IMOs in USAR-EUR during Datalect's contract, and every computer user had access to at least one, and probably several, IMOs. The Army periodically conducted orientation and training sessions for IMOs related to computers and computer problems, including instructions on the diagnosis and correction of computer malfunctions. IMO training increased during Datalect's contract.

Self-maintenance was not only performed by IMOs, however. Users, help desk personnel, and other government personnel also performed computer troubleshooting or repair. Self-maintenance activities ranged from basic correction of computer problems to actually replacing parts within computers.[3] The Army also set up at least two repair "shops" in certain units that performed repairs on computer equipment, including tier-III equipment. Army personnel also engaged in cannibalization, defined by defendant as "instances such as when a malfunctioning computer is repaired by replacing a malfunctioning part with a part from another computer, then having Datalect replace the missing part in the 'donor' computer."[4] (Def.'s Prop. Findings of Uncontroverted Fact at 11.)

**New Computers**

In addition to the "self-maintenance" performed by Army personnel, the government acquired a large number of new computers during the term of Datalect's contract. Between fiscal years 1991–1994, the purchase rate for new computer systems approximately doubled,[5] due in part to the long awaited arrival of "486" generation computers, as well as to budgetary and administrative factors. A significant number of these new computers purchased by the Army came with warranty periods ranging from one to five years. The Army utilized these warranties, making a significant number of warranty calls to vendors other than Datalect during the term of Datalect's contract.

---

3. Defendant defines "self maintenance" as "an instance where a piece of computer equipment fails but is made to operate satisfactorily by the user, information management officer, help desk personnel, or other Government personnel without making a service call to Datalect." (Def.'s Prop. Findings of Uncontroverted Fact at 17.) Plaintiff defines "in-house," or self-, maintenance as:

> [A]ny service that could be ordered under the contract and that is not ordinarily incident to moving, setting up, and using properly functioning computer equipment. Checking cables and turning on the power are ordinary parts of setting up and operating a computer, as is dusting off the equipment. Opening the box to replace motherboards, serial boards, other peripheral boards, hard drives, floppy drives, print heads, power supplies, fuses, and batteries or to clean thoroughly the internal workings is *not* part of ordinary use, and therefore, was to be performed by Datalect alone.

(Pl.'s Opp'n to Def.'s Mot. for Summ. J. and Cross-mot. for Partial Summ. J. as to Entitlement at 13–14 n. 19 (emphasis in original).)

4. In a letter to Datalect dated November 22, 1994, James Demetroulis, the contracting officer, recognized the occurrence of cannibalization and invited dialogue between the government and Datalect on "reimbursement for parts where multiple unrelated failures occurred in a single machine, and in cases where it is evident that these failures were not the result of normal wear and tear but appear to be a consolidation of failures in a single machine." (Def.'s App. at 24–26.) In addition, Mr. Demetroulis advised Datalect that "[i]n cases of cannibalization (defined as internal parts missing), ... you are requested to charge for a technical inspection in order to close the call, and to notify this office immediately.... Cannibalization is not authorized and these individuals may be held accountable for the cost of repairs/replacements." (*Id.*)

5. In fiscal year 1989–1990, the acquisition rate was approximately 2,100 systems per year, while in fiscal years 1991–1994, despite the drawdown, the acquisition rate was approximately 5,000 systems per year.

Alfie Karmal, the signatory of Datalect's Best and Final Offer, stated that in preparing its bid, personnel at Datalect knew of the troop drawdown and the plans of the government to purchase new equipment. Datalect did not know, however, the extent of the government's plans to purchase new equipment or the duration of the warranty agreements that would be negotiated with respect to the new equipment. In fact, Datalect's position on the warranty work for the new tier-III equipment purchases is that it should have handled such work.

### Preparation of the "Estimate"

As stated above, while the location of the official "estimate" of the government's requirements in the solicitation and resulting contract is unclear, both Technical Exhibit 1 and Contract Section B incorporated the historical workload information during fiscal year 1991 under the Sorbus contract. Mr. Selken, the COR who prepared the CLINs in Contract Section B, did not know until after the solicitation went out that some Army Commanders had decided to do their own maintenance of tier-III equipment. During oral argument, however, defendant acknowledged that such in-house maintenance of tier-III equipment had been encouraged by the Army and the Fifth Signal Command during the early 1990s. Defendant stated that "[t]he Army has prerogatives to try to cut costs, to try to be more efficient, etc., etc. One of the things they did in the early 1990s was to beef up its IMO training program. No dispute about that." (Trans. at 34.)[6]

Mr. Selken also did not know that the Army was planning on purchasing a significant number of new computers under extended warranties during the term of Datalect's contract. It was well known in the USAREUR, however, that purchases and negotiations for new Tier III equipment were occurring both before and during the solicitation for the Datalect contract. Defendant acknowledged that "the solicitation did not purport to set forth factors (such as the purchase of new computers) that may have affected the number of service calls to the

contractor." (Def.'s Statement of Gen. Issues at 4.)

### Datalect's Claim

On March 17, 1995, after several letters requesting information from USAREUR on the reduced call rate, Datalect submitted a claim for an equitable adjustment based upon its assertion that the Army "breached" the contract by failing to disclose all relevant facts necessary for Datalect to accurately prepare its bid, and by failing to utilize Datalect to provide all of the government's requirements under the contract. Datalect claimed that its reliance on the high estimate of service calls resulted in Datalect's bid being "unrealistically low" to the detriment of Datalect and to the benefit of USAREUR. On March 27, 1995, the contracting officer denied Datalect's claim in its entirety, stating that the total estimated quantities in the solicitation were merely estimates based on the most current information available, which may or may not have resulted in service calls.

Plaintiff filed a complaint in this court on May 8, 1995. Plaintiff claims that defendant breached its duty to consider certain relevant information when compiling the workload estimates, including: (1) the impending troop drawdown; (2) plans to purchase new computer equipment with extended warranties; and (3) the intention to service its own computers during that time. Plaintiff also contends that defendant breached the contract by depriving Datalect of service calls by: (1) performing self-maintenance; and (2) utilizing extended warranty agreements on new computers.

Plaintiff seeks damages of $2,749,721 as of March 7, 1995 (plus subsequent damages), in compensation for its lost revenue, and costs. In addition, plaintiff asks for an order to the Army that it refrain from diverting service calls to its own maintenance facilities. Defendant filed a motion for summary judgment as to both entitlement and damages, and plaintiff responded with a cross-motion for partial summary judgment as to entitlement.

**6.** References to the Transcript of the September 17, 1997 Oral Argument on the parties' motions are cited as "Trans."

## DISCUSSION

### I. Summary Judgment

Summary judgment is appropriate when there exist no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court does not weigh the evidence; it only determines questions of law based upon undisputed facts. Disputes over facts which are not outcome determinative, however, will not preclude the entry of judgment. *Id.* at 248, 106 S.Ct. at 2510. When the moving party has met its burden of showing entitlement to judgment as a matter of law, the burden shifts to the non-moving party to provide facts establishing that a genuine issue for trial exists, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), and the non-moving party may not discharge its burden by cryptic, conclusory, or generalized responses. *See Willetts v. Ford Motor Co.*, 583 F.2d 852, 856 (6th Cir.1978); *Tunnell v. Wiley*, 514 F.2d 971, 976 (3d Cir.1975).

■ When the parties have filed cross-motions for summary judgment, as in this case, the court must evaluate each party's motion on its own merits. The court's duty to decide whether summary judgment is appropriate is not abrogated by the fact that both parties argue in favor of summary judgment and allege that there are no genuine issues of fact for trial. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390–91 (Fed. Cir.1987)); *see also Bataco Indus., Inc. v. United States*, 29 Fed. Cl. 318, 322 (1993), *aff'd*, 31 F.3d 1176 (Fed.Cir.1994). Summary judgment will not necessarily be granted to one party or another simply because both parties have so moved. *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992) (citing *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692–93 (4th Cir. 1968)). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968); *Bataco*, 29 Fed. Cl. at 322. The court must evaluate each party's motion independent of the other, and resolve all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors*, 812 F.2d at 1391.

Defendant moved for summary judgment as to plaintiff's claim of liability on the part of the government and plaintiff's measure of damages, on the grounds that: (1) plaintiff is not entitled to payment for the historical number of service calls depicted in the contract because the contract does not require the evaluation or disclosure of factors that may affect the historical workload requirements; and (2) the government initiated service calls to Datalect when the government had the need to purchase such services from an outside vendor, which is all the contract requires. Plaintiff cross-moved for partial summary judgment only as to entitlement, alleging that the quantum of plaintiff's injuries is disputed. Plaintiff alleges that defendant is liable for: (1) failing to base its estimate of requirements on the most current information available; and (2) failing to call on Datalect to fulfill the government's actual requirements for tier-III maintenance and repair.

After careful consideration of the parties' arguments, the court concludes that this case is ripe for summary judgment on the entitlement issue. As discussed below, the court finds that: (1) defendant's failure to consider information available to it in formulating its estimate constituted a breach of its duty to provide an accurate estimate; and (2) the government did not breach the requirements contract by performing in-house maintenance and utilizing extended warranty arrangements for tier-III maintenance and repair, because it was only required to purchase Datalect's services when it had a need to purchase such services. Therefore, defendant's motion for summary judgment is denied with respect to the estimate and with

respect to the measure of damages, and is granted with respect to the alleged breach of contract. Plaintiff's cross-motion for partial summary judgment as to entitlement is granted with respect to the government's negligent estimate and denied with respect to the alleged breach of contract.

## II. Faulty Estimate

A requirements contract provides for filling all actual requirements of the government for supplies or services during the contract period by purchasing from the awardee, who provides them at the agreed price. 48 C.F.R. § 16.503(a) (1996). Such arrangements are appropriate when the government anticipates recurring requirements but cannot predetermine the precise quantities of supplies or services that will be necessary during the contract period. 48 C.F.R. § 16.503(b) (1996).

 In a solicitation contemplating a requirements contract, a contracting officer must include an estimate of the quantity of supplies or services to be ordered under the requirements contract in order to provide offerors a guideline as to the contract's magnitude and scope. The Federal Acquisition Regulations state that:

> For the information of offerors and contractors, the contracting officer shall state a realistic estimated total quantity in the solicitation and resulting contract. This estimate is not a representation to an offeror or contractor that the estimated quantity will be required or ordered, or that conditions affecting requirements will be stable or normal. The contracting officer may obtain the estimate from records of previous requirements and consumption, or by other means, and should base the estimate on the most current information available.

48 C.F.R. § 16.503(a)(1) (1996). This regulation allocates to the contractor the risks associated with a variance between actual purchases under the requirements contract and the reasonably estimated quantities. *See Medart, Inc. v. Austin,* 967 F.2d 579, 581 (Fed.Cir.1992). Indeed, the Datalect contract specifically provided that "if the Government's requirements do not result in

orders of the quantities described as 'estimated' or 'maximum' . . ., that fact shall not constitute the basis for an equitable price adjustment." (Def.'s App. at 99.) Estimated quantities are "not guarantees or warranties of quantity[,]" *Shader Contractors, Inc. v. United States,* 149 Ct.Cl. 535, 276 F.2d 1, 4 (1960), and a significant variance between estimated quantities and actual purchases under a contract does not, in itself, give rise to liability on the part of the government. *See Clearwater Forest Indus., Inc. v. United States,* 227 Ct.Cl. 386, 650 F.2d 233, 240 (1981); *see also Womack v. United States,* 182 Ct.Cl. 399, 389 F.2d 793, 802 (1968).

 This risk allocation associated with requirements contracts, however, is only applicable when the government's estimate is reasonably prepared. An offeror on a government contract is entitled to rely on the government estimate set forth in the contract as representing an honest and informed conclusion. *Womack,* 389 F.2d at 801 (citing *Snyder–Lynch Motors, Inc. v. United States,* 154 Ct.Cl. 476, 292 F.2d 907, 909–10 (1961)); *see also Medart,* 967 F.2d at 581 ("[P]resumably contractors rely on the proffered estimates in formulating their bids . . . ."). In formulating its estimate, "the government must act in good faith and use reasonable care in computing its estimated needs; it is not free to carelessly guess at its needs." *Medart,* 967 F.2d at 581. The government is bound by a good faith standard which requires it to seek the most current information available, and either reformulate its estimate when warranted by the information available, or notify offerors of situations or factors likely to affect the estimate. *See* 48 C.F.R. § 16.503(a)(1) (1996) ("The contracting officer . . . should base the estimate on the most current information available."); *see also Medart,* 967 F.2d at 582 (stating that in formulating its estimate, the government must take into account information "reasonably available" to it); *see also Chemical Tech., Inc. v. United States,* 227 Ct.Cl. 120, 645 F.2d 934, 945–46 (1981) (finding the government's estimate preparation unreasonable and that it should at least have notified bidders of the potential occurrence of a situation that significantly affected its requirements).

Accordingly, "[w]here a contractor can show by preponderant evidence that estimates were 'inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made[,]' the government could be liable for appropriate damages resulting." *Medart*, 967 F.2d at 581 (quoting *Clearwater Forest*, 650 F.2d at 239).

Defendant does not dispute that the government was aware of several factors that would likely affect the government's requirements during the term of Datalect's contract, including the troop drawdown, the encouragement of and resulting self-maintenance of tier-III equipment, and the influx of new computers with extended warranties. Defendant stated the following during oral argument:

> Did the government know of factors that could impact the call rate? The answer is taken as a whole, yes, the Government knew there was going to be a troop drawdown. The Government knew that the Government was going to purchase new computers. The Government knew that IMOs were being trained to troubleshoot computers.

(Trans. at 31.) Additionally, defendant states in its motion for summary judgment that "[p]lainly, such an attempt to depict conditions that could affect the Government's requirements was not undertaken in the solicitation, and was not required." (Def.'s Mot. Summ. J. at 9 (emphasis in original).) As a result, in formulating its estimate, the government merely restated in Technical Exhibit 1 (or slightly altered in Contract Section B) its 1991 historical workload, without incorporating in the estimate its knowledge that the government's requirements could be affected by the several factors described above.[7] As a result of the government's

failure to take into account such factors in formulating its estimate, the court holds that defendant negligently prepared its estimate and that plaintiff is therefore entitled to recover.

Defendant cites *Medart* in support of its argument that the historical workload submitted as the government's estimate was sufficient, and that any additional manipulation of such estimates to account for factors that may affect its requirements was not required by the contract. *Medart* involved a requirements contract to supply cabinets to federal agencies through the General Services Administration ("GSA"). *Medart*, 967 F.2d at 580. The contractor alleged that the government had negligently formulated its estimated needs by only using the prior year's orders as its guide. *Id.* at 581. The contractor argued that the government should have, among other things, contacted or polled end-users about their projected needs and budgets, considered the use of statistical formulas such as regression analysis, used more than one year's ordering history, and checked the effectiveness of its estimating procedure based on past performance. *Id.* In finding for defendant, the court rejected the need for such speculation, stating that while these approaches may have improved the accuracy of the estimate, the government is not obligated to search for or create additional information. *Id.* at 582. The government must simply use the most current information (whether such information is records of previous consumption or other information) that is reasonably available to it. *Id.;* see also *Crown Laundry and Dry Cleaners, Inc. v. United States*, 29 Fed. Cl. 506, 523 (1993) (holding that the failure to act on suspicions that additional factors that could affect the estimate exist provides a basis for awarding damages); *see also* 48 C.F.R.

---

7. While the location of the official "estimate" is unclear, both Technical Exhibit 1 and Contract Section B are based on the 1991 historical workload. Contract Section B incorporates a few additions and changes to the 1991 workload. In analyzing the government's estimate under the cross-motions for summary judgment, the court considered each motion independently and resolved all inferences against the moving party. In granting plaintiff's motion for summary judgment on the estimate issue, the court took as true

defendant's contention that the official "estimate" was contained in Technical Exhibit 1. The court further determined that while the location of the estimate is unclear, that fact is not material to the outcome in that both Technical Exhibit 1 and Contract Section B were based upon the same 1991 historical workload information, and any differences between the two were immaterial for the purposes of the court's analysis.

§ 16.503(a)(1) (1996) (estimate to be based on most current information available). In the case at bar, defendant's reliance on *Medart* is misplaced because in *Medart*, there was no information available at the time the estimate was created that indicated that the government may have misstated its requirements. *Medart*, 967 F.2d at 581–82. By contrast, when information exists, such as in the present case, *Medart* actually requires its evaluation or disclosure. *See id.*

Defendant further argues that while it knew of factors that could have affected the estimate, the contract explicitly warned that the estimate was not a representation or warranty that the government's requirements would meet the estimate, and that the clause accompanying Technical Exhibit 1 specifically warned bidders to formulate their own estimate from their knowledge of the trade. Despite defendant's claims, however, the government's duty to provide an accurate estimate is not fulfilled through warnings that the estimates may be incorrect. The purpose of the estimate is to provide bidders with an idea of the magnitude and scope of the contract, and to allow them to bid accordingly. *See Shader*, 276 F.2d at 7 (stating that while estimates are not guarantees or warranties of quantity, they are "figures which the bidders might reasonably employ so as to make realistic quotations"). "Intrinsically, the estimate … must be the product of such relevant underlying information as is available. . . . If the bidder were not entitled to so regard it, its inclusion in the invitation would be surplusage at best or deception at worst." *Womack*, 389 F.2d at 801. Any disclaimer by the government that it disclosed to bidders that the "estimate" was the 1991 workload is inadequate when additional information is available, as bidders are left to presume that there weren't any additional factors that could affect the historical workload. Therefore, even if defendant's contention that Technical Exhibit 1 contained the official estimate is taken as true, the court finds that the government's duty to provide a reasonable estimate requires more when additional information is available upon reasonable investigation. The government is clearly in the best position to acquire such information about its internal operations and needs, and to determine what effect, if any, such information would have on the estimates of its requirements.[8]

■ Here, Datalect's bid prices reflected the estimate of approximately 60–65 calls per day by creating an average of the most and least expensive items for each CLIN based upon the estimate and its costs to perform that many calls. Datalect was prepared during the contract term to perform at least that many calls. Datalect reasonably relied upon the government's estimates while the estimates had been negligently and unreasonably prepared. Accordingly, Datalect is entitled to recover for the government's negligence. Plaintiff's cross-motion for summary judgment is granted with respect to the estimate, and defendant's motion for summary judgment on the estimate issue is denied.

## III. Breach of Contract For Failure to Order All Requirements From Datalect

Defendant moved for summary judgment as to plaintiff's claim that defendant breached the contract by failing to order all of its actual requirements for tier-III maintenance and repair from Datalect. In its motion, defendant concedes that the government performed in-house maintenance on tier-III equipment, and sent some work out under

---

8. In addition, if during the course of the contract term the government substantially changed (increased or decreased) its requirements as a result of factors unrelated to simple user demand, the government's implied duty of good faith and fair dealing may require it to inform the contractor of such changes, and to officially update the estimate to better reflect the changed requirements. *See Celeron Gathering Corp. v. United States*, 34 Fed. Cl. 745, 752–53 (1996). In *Celeron*, the court held that the government's failure to "candidly disclose," by updating the estimate or otherwise, to the contractor extensive problems with an oil well that would substantially affect the government's supply of oil under a contract to supply crude oil constituted a breach of the government's duty of fair dealing. *Id.* at 752. The court stated that "[w]hether framed as a failure to cooperate, a failure to disclose later superior knowledge, or even a failure to update an estimate, the government's conduct was simply unjustifiable." *Id.* at 753.

extended warranty arrangements.[9] Defendant alleges that the contract permitted both in-house maintenance and warranty repairs. Plaintiff cross-moved for partial summary judgment, alleging that the failure of the government to send *all* of its actual, objective requirements for tier-III maintenance and repair to Datalect constituted a breach of contract. For the reasons set forth below, the court grants defendant's motion for summary judgment, and denies plaintiff's cross-motion for summary judgment, as to the alleged breaches of contract.

## A. The Requirements Clause

A determination of whether the government's in-house maintenance and utilization of new warranties was proper requires an interpretation of the requirements clause in the Datalect contract:

Except as this contract otherwise provides, the Government shall order from the contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.

(Def.'s App. at 99.) Defendant argues that the contract language "required to be purchased" entitles the government to purchase services from plaintiff only when the need arises to actually purchase such services. Plaintiff alleges that the contract terms require the government to purchase services from Datalect whenever a need materializes for the maintenance or repair of tier-III equipment. Plaintiff, therefore, interprets the contract as restricting any in-house main-

tenance by the government, and as restricting the government's ability to use new warranty arrangements. Plaintiff claims that any other interpretation would render the contract unenforceable for lack of consideration.

## B. Requirements Contract—Enforceable With Appropriate Consideration

■ The earmark of a requirements contract is that the government agrees to purchase all of its actual requirements for specified supplies or services from the awardee, who provides them at the agreed price. 48 C.F.R. § 16.503(a) (1996). Requirements contracts lack a promise from the buyer to order a specific amount, but consideration is furnished, and the contract is rendered enforceable, by the buyer's promise to turn to the seller for all such requirements as they develop. *Torncello v. United States*, 231 Ct. Cl. 20, 681 F.2d 756, 761 (1982). The entitlement of the seller to all of the buyer's requirements is the key, for if the buyer were able to turn elsewhere for some of its needs, then the contract would be unenforceable for lack of consideration.[10] *Id.* at 761–62. Thus, a requirements contract must contemplate an exclusive relationship between the contractor and the government, where the contractor has the exclusive right and legal obligation to fill all of the government's needs for the services or goods covered by the contract. *Modern Sys. Tech. Corp. v. United States*, 979 F.2d 200, 205 (Fed.Cir.1992) (citations omitted).[11]

---

**9.** The court's analysis applies only to the use of those warranties on new tier-III equipment purchased after the award of the Datalect contract. Such warranties were often "extended warranties" of between one and five years, and are referred to in this order as "new warranties."

With respect to warranties on equipment in use at the time the contract was awarded, Datalect's Best and Final Offer stated:

Datalect will, in conjunction with the U.S. Government, negotiate a practical solution to failed equipment still in warranty. The obvious solution would be for Datalect to handle warranty work on behalf of the manufacturer. This would obviate the need to suffer lengthy delays with manufacturers' warranty turnaround times.

(Def.'s App. at 193.) The court has no knowledge of whether such a "practical solution" was ever negotiated.

**10.** In that case, the contract would be indistinguishable from an indefinite quantity contract with no stated minimum, which is unenforceable for lack of consideration. *See Mason v. United States*, 222 Ct.Cl. 436, 615 F.2d 1343, 1346 n. 5 (1980). An indefinite quantity contract lacks a promise to buy all requirements from the contractor, and is only enforceable if the government promises to purchase a minimum amount of goods or services. *Id.*

**11.** While the parties stipulate that the contract at issue was one for requirements, the court must make its own determination of the type of contract at issue. *See Crown Laundry*, 29 Fed. Cl. at 515 ("[T]he court is not bound by the name or

**C. The Requirements Clause Properly Excludes Services Performed In–House and Services Procured Through "New" Warranties**

In light of the above definition of a requirements contract and the requirements clause at issue in this case, the court must first determine what must be purchased under the requirements clause, and whether the resulting relationship grants appropriate consideration to each party. Pursuant to the requirements clause in the contract, the government's requirements for Datalect's services were those that it required *to purchase,* rather than all of the needs of the government for tier-III maintenance or repair. Consideration was therefore furnished under the contract through the government's promise to call on Datalect (and no other contractor) when it required to purchase, rather than when it simply needed, tier-III maintenance or repair. Such consideration renders the contract fully enforceable as a result of the exclusive relationship created between the government and Datalect. In light of the above interpretation of the contract, the court holds that because the government's self-maintenance and use of new warranty arrangements constituted instances in which the government did not *need to purchase* tier-III maintenance, such activities fell outside of the government's requirements under the contract, and therefore did not constitute a breach of the contract.

Plaintiff puts forth several arguments in support of its position that the government's in-house maintenance and/or the use of the new warranty agreements constituted breaches of the requirements contract. For example, in support of its argument that in-house maintenance constitutes a breach, plaintiff cites two cases binding upon this court, *Inland Container, Inc. v. United States,* 206 Ct.Cl. 478, 512 F.2d 1073 (1975),

and *Mason v. United States,* 222 Ct.Cl. 436, 615 F.2d 1343 (1980), that are clearly distinguishable from the present case. *Inland Container* held that the Defense Depot, a facility of the Defense Supply Agency, Department of Defense, breached requirements contracts providing that the government would order from the contractor all of the boxes which were "required to be purchased." *Id.* 512 F.2d at 1075. During contract performance, the Defense Depot acquired boxes from the GSA rather than the contractor. *Id.* The Defense Depot defended its actions by stating that the "requisitioning" of boxes from GSA, as a sister agency, was proper because they are part of the same entity (the government). *Id.* 512 F.2d at 1076. The court disagreed, stating that the Defense Depot purchased boxes systematically and continually through GSA as its purchasing arm to meet the Depot's requirements, and even paid the costs of GSA in purchasing the boxes. *Id.* at 1077. *Inland Container* merely held that the purchase of boxes from another contractor (through the GSA) constituted a breach, and therefore does not support plaintiff's claim that in-house maintenance is always improper under requirements contracts. *See id.* Therefore, *Inland Container* is inapplicable to the case at bar in that Datalect has not alleged that defendant purchased tier-III maintenance services from another contractor.

In *Mason,* the court determined that the government's awarding of work to contractors other than plaintiff was proper under the contracts at issue because such contracts were indefinite quantity contracts rather than requirements contracts. *Mason,* 615 F.2d at 1350. In support of its argument that in-house maintenance in conjunction with requirements contracts is improper, plaintiff quotes, out of context, dicta from *Mason* that stated that the contracts at issue

label given to a contract."). In determining the type of contract, an interpretation that saves the contract instead of voiding it is favored. *Torncello,* 681 F.2d at 761 (citations omitted). If a contract is susceptible of interpretation as either a requirements contract or an indefinite quantity contract, the court should uphold it as being a requirements contract. *E.H. Sales, Inc. v. United States,* 169 Ct.Cl. 269, 340 F.2d 358, 360–61 (1965). In addition, courts favor validating con-

tracts, not invalidating them, especially when the contract has been fully performed. *Crown Laundry,* 29 Fed. Cl. at 517. In light of the parties' intent that the contract be one for requirements, and the court's finding below that the government's promise to buy *all* of its requirements for tier-III maintenance services *that it needed to purchase* provides adequate consideration to render the contract enforceable, the court finds that this was properly a requirements contract.

were not requirements contracts because if that were so "the Government would not be allowed to either itself perform the work or have other contractors do so," which the contracts clearly allowed. *Id.* 615 F.2d at 1348. *Mason,* however, also stated that if the contracts were for requirements, "whenever defendant chose to order *work of the type described in plaintiff's contracts,* it was legally bound to order all such work from plaintiff." *Id.* 615 F.2d at 1347 (emphasis supplied). *Mason* therefore limited the need to order all requirements from plaintiff to those requirements that the contract explicitly described or defined. In *Mason,* the type of work described in the contracts constituted the *same work, or requirements,* under the contract that would have been both supplied by the contractor and the government, thus precluding the exclusive relationship to provide all of the requirements for that service. In the case at bar, while both Datalect and the government may have been performing maintenance and/or repair on tier-III equipment, the actual requirements were divided by the contract into two distinct categories, those that the government *needed to purchase* and those that it *did not need to purchase.* The court's analysis of the requirements clause renders the contract fully enforceable in that, under the court's interpretation, Datalect had the exclusive opportunity to supply all of the government's requirements for tier-III maintenance that it required to purchase.

Plaintiff also highlights that the government could have reserved for itself the right to perform in-house maintenance by utilizing an alternative requirements clause rather than the standard clause in the Datalect contract. While Federal Acquisition Regulation (FAR) 16.505(a) requires the contracting officer to include the standard requirements clause located at FAR 52.216–21 in all requirements contracts, the same regulation allows the contracting officer to instead insert one of four alternative requirements clauses. 48 C.F.R. § 52.216–21 (1996). Specifically, plaintiff argues that Alternative I, which is designed to be inserted in situations when "the requirements contract is for non-personal services and related supplies and covers estimated requirements that exceed a

specific Government activity's internal capability to produce or perform," would have been more appropriate considering the government's intention to have others perform the same work in-house and its intention to enter into and to utilize the new warranty arrangements. 48 C.F.R. § 52.216–21 (Alternative I) (1996). Alternative I directs the following clause to be inserted in lieu of the clause used in the Datalect contract:

> The estimated quantities are not the total requirements of the Government activity specified in the Schedule, but are estimates of requirements in excess of the quantities that the activity may itself furnish within its own capabilities. Except as this contract otherwise provides, the Government shall order from the Contractor all of that activity's requirements for supplies and services specified in the Schedule that exceed the quantities that the activity may itself furnish within its own capabilities.

*Id.* While the court agrees with plaintiff that the government's failure to use the alternative clause is at least confusing, it does not entitle plaintiff to a finding of breach. As stated above, the requirements clause actually utilized in the Datalect contract itself properly allows for in-house maintenance and the use of new warranty arrangements.

Plaintiff further argues that with respect to the use of new warranty arrangements, an answer given by the government during the solicitation process illustrates that the government intended Datalect to perform maintenance and repair services on tier-III equipment purchased after the award of the Datalect contract, whether or not such equipment was under warranty. On October 21, 1992, the government issued Amendment 2 to the solicitation, which included answers to several questions from bidders. Included was the following question from an offeror and answer from the government:

> Q.26 Reference Section I, Contract Clauses 1–63. Will only the equipment referenced in the workload estimates be covered under this contract or will any equipment purchased during the life of the contract also be covered?

A.26 Equipment in the workload estimates will be covered and also all desk top equipment purchased under the purview of 5th Signal Command during the life of the contract.

(Def.'s App. at 103.) Plaintiff states that it interpreted the answer to this question to mean that it would perform maintenance on all new tier-III equipment, regardless of whether such equipment was under warranty. If the new equipment, however, was under warranty, the government clearly would not have a need to purchase maintenance and/or repair on such equipment during the term of the warranty. While having a four year (one year with three one year options) contract to obtain services already furnished by other contractors under one to five year warranties appears to be fiscally irresponsible, the plain language of Datalect's contract allowed the government to utilize its warranties because in that case the government would not have a requirement to purchase those services from Datalect. In light of the court's finding above that the requirements clause only obligated the government to procure from plaintiff that which it required to purchase, defendant's activities under the contract in utilizing new warranty arrangements to obtain maintenance and/or repair on the new tier-III equipment was proper.

■ Finally, the court has considered plaintiff's numerous other arguments in support of its allegations that the government's in-house maintenance and use of extended warranties was improper, and has found them to be without merit. There is no dispute as to any material fact relating to the issues of whether the in-house maintenance or the use of the new warranties was permissible under the contract, or whether the activities constituted a breach of the requirements contract. As a result of the court's finding above that the in-house maintenance and the use of the new warranties fell outside of what was "required to be purchased," the court finds that the government did not breach the requirements contract. Therefore, defendant's motion for summary judgment as to the breach issues is granted, and plaintiff's cross-motion for summary judgment as to those issues is denied.

## IV. Damages

■ Defendant moved for summary judgment on plaintiff's measure of damages—the difference between the number of calls depicted in the estimate and the actual calls received by Datalect—as being overly simplified, resulting in Datalect being unable to prevail under any of its "breach" theories. Defendant contends that plaintiff has failed to meet its burden of establishing liability, causation, and resultant injury with reasonable specificity, citing *Servidone Construction Corp. v. United States*, 931 F.2d 860, 861 (Fed.Cir.1991). In light of the court's finding however, that the government's in-house maintenance and use of warranties were proper under the contract, defendant's damages argument is moot with respect to those alleged "breaches." In addition, the court finds that Datalect's alleged damages resulting from the government's faulty estimate is a material fact properly in dispute, and therefore defendant's motion for summary judgment on this issue, if it so moved, is denied.

## CONCLUSION

If the estimate of the government's requirements had been reasonably accurate and had accounted for the several situations likely to affect the magnitude of the government's requirements, the government's performance of in-house maintenance and repair on tier-III equipment and its use of the new warranties would not have so severely damaged Datalect. What the court finds objectionable in this case is not the performance of the in-house maintenance or the use of extended warranties, but the failure of the government to account for these, and other, known factors in its original estimate. The court, therefore, holds the government responsible for its negligent estimate in this case, but does not find that the government violated the contract by performing in-house maintenance or by utilizing the new warranties.

As a result of the foregoing, the court grants plaintiff's cross-motion, and denies defendant's motion, for summary judgment on

the issue of the faulty estimate. The court grants defendant's motion, and denies plaintiff's cross-motion, for summary judgment as to the alleged "breaches" of contract, including the use of self-maintenance and the use of the new warranties. The court denies defendant's motion for summary judgment on the damages issue, and orders the parties to confer as to the appropriate amount of damages to which plaintiff is entitled. The parties shall contact the court within thirty days to schedule a status conference on how to proceed.

**IT IS SO ORDERED.**