**DATALECT COMPUTER SERVICES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 95–328C, 00–120C.**

United States Court of Federal Claims.

April 8, 2003.

■

---

Robert B. Breisblatt, Chicago, IL, for plaintiff. Philip D. Segrest, Jr., Welsh & Katz, Ltd., of counsel.

Brian S. Smith, Washington, DC, with whom was Assistant Attorney General Robert D. McCallum Jr., for defendant. Major Samuel W. Morris, United States Army, of counsel.

## *OPINION*

MILLER, Judge.

A computer service contractor asserts that it is entitled to recoup the losses—caused by the negligent estimates of repair needs—that were incurred during the life of its contract with the Government. The contractor also claims entitlement to compensation for warranty calls diverted to a third-party service provider during the life of the contract.

These consolidated cases follow earlier decisions by the trial court denying liability for the warranty calls, finding the Government liable for negligent estimates, and rejecting proof of damages for the first two years of the contract. The Federal Circuit called for a redetermination of liability for warranty calls and a trial on damages for contract years that were not included in the earlier trial. Trial after remand addressed liability and damages for the warranty calls and damages for the negligent estimates under follow-up years to the contract.

## FACTS

The earlier filed case, No. 95–328C, has generated three opinions, each of which provides germane background information. *See Datalect Computer Servs., Ltd. v. United States,* 40 Fed.Cl. 28 (1997) (Tidwell, S.J.) ("*Datalect I*") (granting summary judgment on liability for negligent estimates and rejecting liability for diverted warranty calls); *Datalect Computer Servs., Ltd. v. United States,* 41 Fed.Cl. 720 (1998) (Tidwell, S.J.) ("*Datalect II*") (rejecting damages claims for negligent estimates); and *Datalect Computer Servs., Ltd. v. United States,* No. 99–5017, 1999 WL 507144, 1999 U.S.App. LEXIS 15985 (Fed.Cir. July 15, 1999) ("*Datalect III*") (vacating judgment denying liability on diverted warranty calls, affirming denial of damages for negligent estimates, and remanding for retrial of warranty claim and

negligent estimate damages for later contract years).

## I. *Background*

The court makes the following findings, which to the extent required complement and supplement those of Sr. Judge Tidwell, insofar as his decisions have been affirmed. The court is indebted to Sr. Judge Tidwell for the clarity of his two opinions. Because the Federal Circuit ordered a redetermination of liability for diverted warranty calls, this opinion of necessity tracks the history of negligent estimates in general, which proceeded in tandem with the development of plaintiff's claim dealing with warranty calls.

### 1. *The EDS contract and the solicitation*

On July 27, 1990, The United States Army Information Systems and Selection Acquisition Agency (the "Army") and Electronic Data Systems Corporation ("EDS") entered into contract DAHC–94–90–D–0012 (the "EDS contract"), an indefinite-delivery, indefinite-quantity contract. The Army contracted for computer hardware, software, and maintenance services for a multiuser integrated office automation support system, known as the Small MultiUser Computer project, or "SMC." The initial contract term was from July 27, 1990, to September 30, 1990. The contract exercised the first option year, extending contract performance through September 30, 1991. The contract contained a series of contract line item numbers, or "CLINs," which detailed the individual computer parts and services offered under the contract. Each part or service also had a price, listed in U.S. dollars, at which EDS would supply the requested item or service. The contract warranted that each item purchased under the contract would be free from defects for one year. If any purchased item required repair within the one-year warranty period, EDS would furnish the necessary maintenance.

EDS subcontracted with Astronautics Corporation of America ("ACA") on January 16, 1991, to provide the maintenance work required by the EDS contract. The subcontract required EDS to supply the parts necessary to complete a repair. On September

30, 1991, the Army exercised the second option year of the EDS contract, which extended performance through September 30, 1992. This extension renewed the CLINs for maintenance services for computer equipment in Europe. On September 30, 1992, the EDS contract was extended for a third option year. The maintenance CLINs were not renewed, but warranties for all equipment purchased under the contract were extended through September 30, 1993 (the end of the third option year), with warranties on select items to run through September 30, 1994.

On July 23, 1992, the U.S. Army, Europe (also referred to as the "Army") Contracting Center, solicited proposals for maintenance and repair of government-owned Tier–III [1] computer equipment. The contract was to be for one year, with the Army entitled to three additional option years. The covered equipment was located in 5th Signal Command ("5th Signal") bases in various European countries. The solicitation divided the countries into three "blocks:" Block A included Tier–III equipment in Germany; Block B covered Tier–III equipment in the United Kingdom, Belgium, and the Netherlands; and Block C contained Tier–III equipment in Italy.

Each block listed CLINs for repair or maintenance tasks required under the contract; for example, CLIN "0001AB[:] Demand maintenance calls per keyboard," appeared in Block A. Each block was subdivided into four years, reflecting one base year and three option years. Each contract year required the same repair services, as each block's CLINs appeared four times in the solicitation—once in each contract year. Moreover, each of the three blocks required the same repair services from the Tier–III repair contractor.

Following the description of each CLIN appeared a quantity estimate prepared by the Army, a unit of measure, and a space for an offeror to list its proposed price for each CLIN. A contractor submitting a proposal would multiply its CLIN price by the quantity estimate, thus generating the total yearly price for performing a certain repair.

When preparing the quantity estimates for the solicitation, Raymond R. Selken, the Contracting Officer Representative (the "COR") for 5th Signal from 1989 to 1995 and from 1998 to present, relied on the number of maintenance calls placed during FY 1991 to Sorbus GmBH ("Sorbus"), the Army's Tier–III maintenance and repair contractor for its equipment in Europe from 1989 to 1993. The total number of calls placed in FY 1991 was approximately 17,000, and this number was the basis for the quantity estimate for the solicitation's base year. Mr. Selken then made minor downward adjustments for some, but not all, of the CLINs to arrive at estimates for the subsequent option years. Lists of the Sorbus maintenance calls, organized by Army base location, were appended to the solicitation as Technical Exhibit 1. The preface to the exhibit indicated that "[a]ctual workload estimates will have to be derived by the contractor," taking into account the call lists, the contractor's experience in the trade, the equipment density list,[2] and the "aging of equipment." 5th Signal did not supply an equipment density list to offerors, but, as of June 30, 1992, the Army Contracting Center estimated that were approximately 90,000 Tier–III machines in inventory. 5th Signal also did not supply materials on the age of covered Tier–III equipment.

On October 22, 1992, the Army issued Amendment 0002 to the solicitation. Amendment 0002 contained several questions from potential offerors and the responses thereto. Mr. Selken testified that he provided the information used to answer the offerors' questions. Question 26 read: "Will only the equipment referenced in the workload estimates be covered under this contract or will any equipment purchased during the life of the contract also be covered?" The following answer was supplied: "Equipment in the workload estimates will be covered and also all desk top [sic] equipment purchased under

---

**1.** Tier–III equipment is defined in the solicitation's Statement of Work (the "SOW") as "automation equipment used in an office environment [ ] that is user owned, user operated, and does not have a dedicated crew."

**2.** Equipment "density" refers to the number of computers in a certain locale.

the purview of 5th Signal Command during the life of the contract.". Each party ascribes a meaning to this answer that undergirds its position in this litigation.

On November 27, 1992, Datalect Computer Services Limited ("plaintiff") submitted its proposal to service the Tier–III equipment. It becomes important to the unfolding of events that plaintiff is a British firm that never before had held a contract with a U.S. Government entity.

### 2. *Plaintiff's proposal*

In preparing plaintiff's proposal, A. Simon Phillips, employed by plaintiff as a Major Account Sales Manager, testified that he worked with Stuart Johnson, a Regional Representative for plaintiff; Alfie G. Karmal, plaintiff's International Group Sales Director and Mr. Phillips's supervisor; and Peter J. Watts, plaintiff's Managing Director and Mr. Karmal's immediate supervisor. Mr. Phillips was in charge of preparing the "service-related" portions of the proposal, while Mr. Johnson crafted the legal language. Transcript of Proceedings, *Datalect Computer Servs., Ltd. v. United States,* Nos. 95–328C & 00–120C, at 1573 (Fed.Cl. Nov. 4–13, 2002) ("Tr."). Mr. Phillips also helped Messrs. Watts and Karmal "to formulate a pricing model to deliver to the Army"—that is, he analyzed the listed CLINs, associated parts costs, and other factors to assist in formulating plaintiff's prices for each unit item. Tr. 1584–85. Mr. Phillips is listed in paragraph K4 as the person responsible for "determining the prices offered in this ... proposal," and Mr. Watts testified that he authorized the submission of the CLINs.

Mr. Watts did not testify during *Datalect II,* the earlier trial on damages. Because his testimony relates to damages, the court, of necessity, must elaborate on Sr. Judge Tidwell's findings on damages and discuss how information supplied by this key witness addressed issues as to which Sr. Judge Tidwell found the proofs lacking. Not only was Mr. Watts's absence as the person who prepared plaintiff's estimated costs central to the findings in the earlier trial, but he supplied the

type of information that Sr. Judge Tidwell faulted plaintiff for failing to offer. *See Datalect II,* 41 Fed.Cl. at 726–28. The court deems Mr. Watts a particularly credible witness, if for no other reason than his obvious sincerity, because plaintiff jettisoned him from its employ long before trial when contract performance turned sour. Consequently, Mr. Watts had no reason to exhibit partiality to plaintiff. The probativeness of his testimony, however, was limited, as will be revealed.

In formulating plaintiff's CLIN prices, Mr. Watts testified that he analyzed the Army locations covered under the contract, the types of equipment to be serviced, plaintiff's costs, and the solicitation's requirement that the covered equipment be fixed within three business days (or within five business days, if the equipment were removed for repair).[3] In Mr. Watts's opinion, the Army's call estimates were the "key figure" in determining what prices plaintiff should include in its proposal. Tr. 140. Mr. Watts also adjusted CLIN prices to account for the cost of performing a certain repair; for example, laser printers warranted a higher CLIN price because they were more expensive to fix. He indicated that plaintiff's overall goal in submitting its proposal was to be selected for the "short list" of companies that would be invited to submit a best and final offer ("BAFO"). Tr. 122.

Page 2 of plaintiff's proposal claimed that plaintiff performed a "detailed statistical analysis of the Tier–III equipment within the U.S. Government facilities in Europe" and that the "prices contained herein represent the lowest viable price for the efficient service levels demanded by the U.S. Government." Mr. Phillips agreed that, as of the date of the proposal, plaintiff's CLIN prices were the lowest that plaintiff could offer while still ensuring efficient service.

Paragraph 10.3.2 of the proposal contained an "Analysis of Complexities." The proposal labeled as "significant" the fact that the "contract is only guaranteed for one year" and further noted that, "[a]s the majority of the

---

3. Plaintiff was not aware, either before or during its contract performance, of the EDS contract

and the five modifications negotiated to it between 1991 and 1995.

equipment to be maintained is in the middle or at the end of its life cycle, if the contract is curtailed or the U.S. Government call estimates are lower than projected, the contractor could be left with his spare[ ] [parts] investment unused." In paragraph 10.5.6.19, entitled "Equipment Under Warranty," plaintiff resolved "in conjunction with the U.S. Government, [to] negotiate a practical solution to failed equipment still in warranty. The obvious solution would be for [plaintiff] to handle warranty work on behalf of the manufacturer." The parties dispute the meaning and significance of this language.

Plaintiff appended an undated cashflow statement to its proposal, listing plaintiff's cash inflow and costs for calendar year 1993 if awarded the contract. The statement presented costs by various categories, including, *inter alia,* engineer salaries, spare parts, and various overhead costs. The statement predicted a net profit of DM 1,219,600.00 [4] for 1993. Mr. Watts testified that the numbers in this statement were not pared down "to be as small as possible," as plaintiff needed to allow for further reductions in its BAFO. Tr. 147.

On January 21, 1993, plaintiff submitted its BAFO. While an offeror's prices typically fall 5 to 10% between a proposal and a BAFO, Mr. Philips testified that plaintiff was able to reduce its pricing structure around 40% for the Block A and Block B work. In fact, plaintiff lowered its prices for the Block A work by 46%. However, plaintiff's BAFO price for Block A, although lower than the price listed in every other proposal, was within $500,000.00 of the Block A BAFO prices submitted by the next two lowest offerors. Its price for the Block B work was within $100,000.00 of the next lowest BAFO figure for Block B.

Mr. Phillips attributed the idea for the reduction in plaintiff's CLIN prices to Mr. Johnson, who was the absent cognizant witness at this trial. The cover letter to plaintiff's BAFO, dated January 19, 1993, linked plaintiff's ability to reduce its prices to Amendment 0005 to the solicitation, issued on January 18, 1993, whereby the minimum delivery order was lowered from $250.00 to $1.00. The Army was not obligated to place calls to the Tier–III contractor if the work involved cost less than the minimum delivery order threshold. Mr. Phillips, however, characterized Amendment 0005 as "another good justification for lowering the BAFO price," Tr. 1593, while Mr. Watts viewed the modification as solidifying the reliability of the Army's call-volume estimates.

The cover letter to plaintiff's BAFO further stated that the reduction in CLIN prices "is an extremely cost effective solution to the U.S. Army maintenance requirements." Moreover, it advised that plaintiff's revised pricing structure was in line with what plaintiff charged its major British clients.

Mr. Watts approved, but did not prepare, the revised CLIN BAFO prices. Mr. Johnson, Mr. Karmal, and Ian McKellar, plaintiff's Financial Director in the early to mid–1990s, formulated the numbers in plaintiff's BAFO. Mr. Watts attributed plaintiff's ability to lower its prices to its investigation into the various costs that would be incurred under the contract. This investigation enabled plaintiff to appreciate the precise costs involved in hiring engineers, leasing space in Germany, building a German facility, and purchasing spare parts. In calculating the BAFO CLIN prices, plaintiff first determined an average price per service call, using the Army's estimate of approximately 17,000 calls per year, which would ensure that plaintiff covered its costs and retained a profit. This average price then was adjusted as to each CLIN according to the difficulty and cost of performing the repair.

In submitting the BAFO, Mr. Watts did not consult the notes he used in drafting plaintiff's original proposal (the "bid notes"), which were kept in both handwritten and electronic form. Mr. Watts testified that he left the hard copies of his bid notes in his and his secretary's offices, but that plaintiff disposed of them after Mr. Watts was "sacked" in the mid–1990s. Tr. 739. The electronic

---

4. Although the CLIN prices in plaintiff's proposal were stated in Deutsche Marks, the Army evaluated plaintiff's BAFO by converting it into U.S. dollars, and the CLIN prices stated in the EDS contract and its modifications were also in U.S. dollars.

copy of his bid notes was lost when the computer belonging to plaintiff's financial director, Mr. McKellar, crashed.

Mr. Watts, however, did consult a database that he had created at an earlier date when assisting in plaintiff's BAFO preparation; this database tracked plaintiff's prior repair work in the United Kingdom. Mr. Watts explained that the database served "to capture every single item that generated revenue so that it wasn't just based on paper" and "to control the calls so if [a] customer rang up and said what's the status of this call," plaintiff could inform him accordingly. Tr. 219–20. Plaintiff also employed the database to track payments from clients and the costs associated with spare parts and to aid in preparing invoices. The database matched a type of repair with an associated CLIN, thereby enabling plaintiff to know how much to charge for its services.

According to Mr. Watts, plaintiff revised the cashflow statement—previously included with plaintiff's proposal—before constructing its BAFO. The revised statement has a "[p]rinted from file" date of February 5, 1993. Mr. Watts explained that this date reflected when the statement was printed, not when the document was prepared. In the upper right-hand corner of the document is the handwritten phrase "Datalect Germany 'What if.'" Vivian H. Silverman, the Group Financial Director from 1989 to 1995 for CityLink Group, plaintiff's parent company, and plaintiff's Financial Director from 1998 to 2000, testified that he wrote the "What if," which signified that the revised cashflow statement was "awfully close to the figuring" that went on during the BAFO formulation process. Tr. 1452.

Because plaintiff was unable to produce the bid notes and related information, the revised cashflow statement became the cornerstone of plaintiff's proof of its CLIN prices. The revised statement broke down plaintiff's profits and costs under the contract in the same manner as the original statement, but forecasted the projected figures from 1993 to 1996. The 1993 calendar year was broken down by month, while the totals for 1994, 1995, and 1996 were presented only on a yearly basis. Plaintiff's projected profits were divided into the three country blocks called for in the solicitation. No profit was calculated for Block C, the work to be performed in Italy, even though plaintiff's BAFO included CLIN prices for all three country blocks. The statement predicted an inflow of DM 3,951,050.00, for each year from 1993 to 1996 for the Block A work, and a profit of DM 250,410.00, for each of these years for the Block B work.

Plaintiff was awarded the Tier–III maintenance contract, No. DAJA37–93–D–0065, on February 5, 1993 (the "Datalect contract"). Only the work for Blocks A and B were given to plaintiff; Com–Tech Services, Inc. ("Com–Tech"), was the awardee for repairs on Tier–III machines in Italy, or Block C. The requirements clause of plaintiff's contract, paragraph I.61, advised that the "quantity of supplies or services specified in the Schedule are estimates only and are not purchased by this contract." However, the clause also charged the Army with ordering "from the contractor all of the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the schedule."

Paragraph 3.2 of the contract's SOW stated: "The contractor shall furnish all labor and material for demand maintenance. The contractor shall perform all maintenance on authorized Government owned Tier[-]III equipment." Mr. Watts understood this clause to cover "[a]ll of the equipment owned by the American government under Tier[-]III." Tr. 125. Paragraph 3.2.1 in the SOW explained that the maintenance required under the contract included "testing, alignment, adjustment, and replacement of repair parts to restore the equipment to a complete operational status as intended by the manufacturer." If a piece of Tier–III equipment malfunctioned, Mr. Watts believed that the user was obligated to call an Army maintenance desk to ensure that the problem did not result from software failure;[5] if the

---

5. Sr. Judge Tidwell previously found that, when a computer covered by the contract malfunctioned, the user would contact an information management officer, who, if necessary, would then notify the maintenance desk of the need for a repair. *See Datalect I,* 40 Fed.Cl. at 32. This

problem was related to hardware, the desk personnel would notify plaintiff of the need for a repair.

### 3. *Impact of negligent estimates on contract performance; history of warranty extensions*

Performance began on approximately March 8, 1993, with plaintiff establishing a operations base in Germany, known as Datalect GmBH. Plaintiff expected to service the calls within the United Kingdom from its existing British facilities. Mr. Watts created a database for Datalect GmBH similar to the one used to track plaintiff's work in the United Kingdom. When plaintiff received a call from the Army maintenance desk, plaintiff's call controllers—employees charged with entering information into the database—would create a call record, which contained all of the information initially received from the maintenance desk. The call controllers then would group the calls according to location, assign them to one of plaintiff's engineers, and record the call allocations in the database. Plaintiff assumed that an engineer could perform six calls a day, as the contractually mandated three-day (or five-day, if a repair was made off-site) repair time enabled plaintiff to wait until a sufficient number of repair calls were received from the same location before sending an engineer to that site.

The German database allowed plaintiff to prioritize more urgent calls; to track the progress of a repair; to know which engineer performed a certain repair; to understand when a technical support employee solved the problem over the phone; and to monitor which spare parts were used in which repairs. The database also contained a table that chronicled plaintiff's spare parts requisitions and costs. Mr. Watts explained that plaintiff, after replacing a faulty part with one of its spares, often would refurbish the damaged part and use it in a subsequent repair. Plaintiff recaptured the costs associated with the refurbishment by pricing the repaired part at its purchase price. The purchase price chosen was the product of "average pricing," allowing plaintiff to take

into account the age of the refurbished equipment. Tr. 239. Mr. Watts also pointed out that the costs in the database associated with spare parts were not always charged to plaintiff; for example, if plaintiff cancelled a request for a part that it previously had ordered, the cost for that part, although not actually paid by plaintiff, still would appear in the spare parts table.

The contract ran for one base year, with the Army thereafter electing to exercise all three option years. The Army also extended the contract for an additional four months after the end of the third option year, pursuant to paragraph I.63 of the contract, which granted the contracting officer a unilateral right to extend contract duration upon proper written notice to the contractor. In sum, plaintiff's performance ran from March 8, 1993, to July 7, 1997.

According to Mr. Watts, plaintiff realized "[a]lmost immediately" that it was not receiving the number of calls predicted by the Army's estimates. Tr. 171. Dimitri Stavrou, plaintiff's Operations Manager in Germany, wrote a memorandum to COR Selken on October 4, 1993, informing the Army that the call rate for repairs had dropped dramatically in the previous week and that plaintiff's employees had contacted a few maintenance desks to investigate the source of the decrease. The desks presented various reasons for the low call volume, including self-maintenance, institutional reorganization, and damaged phone lines. Mr. Stavrou's memorandum asked Mr. Selken to "sort this situation out," because a fluctuation in service calls prevented plaintiff from forecasting its needs for personnel and from maintaining a steady revenue stream. Mr. Stavrou also requested: "If the Army has decided to go with self-maintenance and just use [plaintiff] as a logistics source[,] please inform us so we can take appropriate action."

Mr. Stavrou again wrote to Mr. Selken on June 21, 1994, complaining of a significant drop in call volume. He claimed that plaintiff "started by logging an average of 60 calls per day," but that this average had fallen to 20 daily calls by the date of the letter, which

court's findings do not detract from Sr. Judge Tidwell's, which have been affirmed.

was far below the Army's yearly estimate adjusted to reflect a daily call volume. Plaintiff challenged the Army's proffered justification that the call volume was dropping because of the troop drawdown in Europe;[6] rather, plaintiff found evidence of "the Army going to self-maintenance;" equipment being "cannibalized," *i.e.,* replacement parts transferred from one machine to another; and maintenance desks fielding their own maintenance teams. Mr. Stavrou estimated that these actions were costing plaintiff DM 253,-000.00 in lost revenue each month.

On July 6, 1994, Mr. Karmal, plaintiff's Sales Director, sent a follow-up letter to the Army Contracting Center. By this date the Army had renewed plaintiff's contract for a second year. Plaintiff had not received a reply to Mr. Stavrou's June 21, 1994 correspondence. Mr. Karmal requested the Army's "thoughts as to what compensation would be applicable" for the Army's use of self-maintenance and reiterated that plaintiff had seen no evidence of the daily call rates increasing. According to Mr. Watts, plaintiff, at this point, believed that the reduced call volume was attributable to "general start up problems" and that nothing "untoward" was happening. Tr. 175. Plaintiff had been assured by the Army that it prohibited self-maintenance of computers and that the self-maintenance would not be "of any consequence." *Id.*

As plaintiff began to express its concerns regarding the decrease in calls, the Army entered into a series of modifications to the EDS contract. On September 30, 1993, the contract was extended through September 30, 1994, the end of the fourth option year. This modification extended all warranties through September 30, 1994, for devices previously purchased under the contract. On July 7, 1994, the EDS contract was renewed for a fifth option year, extending performance through September 30, 1995. For all products purchased on or before September 30, 1993, warranties were extended through July 26, 1995. EDS provided a two-year warranty for all products purchased after September 30, 1993. After the expiration of

this warranty, "mail-in coverage" would be supplied through July 26, 1998.

COR Selken replied to Mr. Stavrou's and Mr. Karmal's letters on July 12, 1994. Mr. Selken accused plaintiff of overstating the decline in call volume and claimed that, on average, 40 calls per day were placed to plaintiff. His letter nonetheless admitted that there were "many factors" behind the fall in expected calls, including the removal of old equipment from the field, the reduction in the number of Army personnel stationed in Europe, and the purchase of new computers which were "under warranty for three years." Mr. Selken reminded plaintiff that there was "nothing in the contract that states that the U.S. Army has to give the contractor a certain number of calls." He also declined to compensate plaintiff for the self-maintenance, "as the Army is not giving any calls to any other contractor."

On July 18, 1994, James H. Demetroulis, the Administrative Contracting Officer for the Datalect contract, also responded in writing to plaintiff's concerns. He echoed Mr. Selken's assessment that the reduction in call volume was not as severe as represented by Mr. Stavrou. Based on his own research, Mr. Demetroulis was able to recount several factors, unrelated to the in-house servicing of computers, that he claimed accounted for the drop in the number of service calls. He admitted that the Army had purchased $15 million worth of new desktop equipment in the previous year and that most "of this new equipment is under warranty for between one and three years. It has replaced much of the older equipment which was the source of many of the Government's service calls to [plaintiff]." He also acknowledged the troop drawdown in Europe as a reason for the small call volume, but maintained that, despite these factors, "call rates have remained fairly consistent."

Mr. Demetroulis reiterated Mr. Selken's assessment that the contract did not restrict the Government from performing in-house maintenance: The "Government is only precluded from using a different contractor while its contract with [plaintiff] is in effect

---

**6.** Sr. Judge Tidwell previously found that plaintiff knew of an impending decrease in the number of American troops in Europe when preparing its BAFO. *See Datalect I,* 40 Fed.Cl. at 33.

...." However, he did state that "[f]uture estimates of call rates will be revised to reflect the new status quo." [7] Mr. Demetroulis testified that he did not perform this revision because he had no authority to do so.

Mr. Demetroulis admitted that by the date he wrote this letter, July 18, 1994, he was aware of the modifications to the EDS contract and the Army's receipt of warranty extensions for machines purchased from EDS.

William S. Fattal, plaintiff's Chairman, responded to Mr. Demetroulis on October 24, 1994. Mr. Fattal attached a list of service calls where signs of cannibalization were discovered and disputed case law that the Army had cited to support its stance that the requirements clause of plaintiff's contract did not preclude the use of in-house maintenance. He accused the Army of "only calling in [plaintiff] for calls which the Army cannot repair, *i.e.*, [plaintiff] in effect is only called in to do the difficult and costly repairs." Mr. Fattal reiterated that plaintiff "made its tender based on the documents and terms disclosed" and that Mr. Fattal had "never come across such a situation before ...."

On November 22, 1994, Mr. Demetroulis responded to Mr. Fattal's October 24, 1994 letter. Mr. Demetroulis offered that the Army would be willing to consider reimbursing plaintiff for parts when multiple unrelated failures occurred in one machine and that plaintiff should notify 5th Signal in cases of cannibalization, as that action was not authorized. Regarding self-maintenance, Mr. Demetroulis quoted from 48 C.F.R. (FAR) § 16.503, which defines the scope of requirement contracts and the legal significance of the Government's estimate: " 'This estimate is not a representation to an offeror or contractor that the estimated quantity will be required or ordered, or that conditions affecting requirements will be stable or normal.' "

The November 22, 1994 letter discussed case law supporting Mr. Demetroulis's position, from which he extrapolated the principle that "[t]he only obligation on the part of the government (other than a showing of good faith) is that once the decision is made to purchase the service, the purchase must be made from the contractor." According to Mr. Demetroulis, "[t]here is no indication (and you have not alleged) that the government has purchased any of the services covered in the contract schedule from another company."

Nonetheless, Mr. Demetroulis admitted in his letter that there had "been an approximate 48% decrease in calls made under this contract." He later testified that this drop was a significant deviation from the Army's call estimates. Mr. Demetroulis's letter pointed to several factors that possibly suppressed the number of calls received, including: 1) the closing of several Army installations since the award of the contract; 2) the purchase of new computers, including 8,000 in FY 1994, all of which carried three-year warranties; and 3) the disposal of 3,000 computers and 3,000 printers during FY 1994. "The end result being [sic] that many of the systems that had exceeded their planned system life have been replaced or disposed of, thus reducing the number of calls made against this contract for overaged equipment."

On March 28, 1995, the Army executed a final modification to the EDS contract. The modification included a list of computer equipment which, if purchased, would carry a two-year on-call warranty. At the termination of the on-call service, EDS would provide mail-in warranty coverage through July 28, 1998.

7. On July 18, 1994, Mr. Demetroulis wrote a similar letter to Com–Tech, the contractor awarded the Block C repair work for Tier–III equipment in Italy, in response to that contractor's complaints that the Army was performing self-maintenance on computers. Mr. Demetroulis contended that the requirements clause of the Com–Tech contract did not prevent the Army from performing in-house maintenance and attributed a reduction in service calls to the purchase of 200 new computers and 150 new printers, all of which were under warranty for three years. His letter stated that future workload estimates would be revised to reflect the change in the number of service calls received.

## II. *Procedural history*

After this flurry of correspondence failed to resolve plaintiff's concerns, Mr. Watts, on behalf of plaintiff, submitted a claim, pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (2003) (the "CDA"), on March 17, 1995, to Mr. Demetroulis seeking an equitable adjustment in the amount of DM 3,872,847.00. The claim charged that the Army breached the Datalect contract by failing to give plaintiff repair services for items covered under the contract and by failing to disclose all "relevant facts" needed by plaintiff to price the CLINs accurately in its proposal.

Attached to the March 17 claim letter was a chart, organized by type of equipment, that traced the discrepancy between the Army's estimates and the actual service calls placed to plaintiff during the first two years of the contract. With respect to some pieces of equipment, plaintiff received less than 50% of the Army's estimated number of calls; on others, the actual calls exceeded the estimates by 100%. Mr. Watts calculated the actual number of service calls by consulting the German database.

By letter of March 27, 1995, Mr. Demetroulis denied plaintiff's claim in its entirety, stating that the quantity estimates were based on the most current information available and that they did not represent a guaranteed call volume.

Plaintiff filed suit in the Court of Federal Claims on May 8, 1995, alleging breach of contract and reiterating the two grounds set forth in its claim. Specifically, the complaint alleged that the estimates in the original solicitation were misleading because of the impending troop drawdown and because of the Army's intention to buy new computers with extended warranties and to perform in-house maintenance on its existing equipment. The Army had an affirmative duty to disclose this information to plaintiff, but failed to do so, thereby resulting in plaintiff's submitting unrealistically low CLIN prices. Plaintiff further alleged that the Army was in breach

because it routed service calls to entities other than plaintiff when it encouraged and performed in-house maintenance of Tier–III equipment and employed extended warranties attached to new computers. Plaintiff sought damages in excess of DM 3,872,-847.00.

Both parties moved for summary judgment on liability, with defendant also seeking judgment on damages. On December 18, 1997, Sr. Judge Tidwell issued an opinion finding that the work estimates in the solicitation were negligently prepared because the Army failed, when constructing the estimates, to take into account the impact of the troop drawdown, the self-maintenance of Tier–III equipment, and the purchase of new computers with extended warranties. *Datalect I*, 40 Fed.Cl. at 36. Defendant could not rely on the clause accompanying Technical Exhibit 1 in the solicitation—advising offerors to use their experience in the industry when formulating their CLIN prices—to absolve the Government from liability because the Army was aware of several potential contract-altering events when formulating its estimates. *Id.* at 37. Thus, plaintiff was entitled to recover damages from defendant's negligent estimates.

In its discussion of the negligent estimates, the court opined, in a footnote, that "if during the course of the contract term the government substantially changed ... its requirements as a result of factors unrelated to simple user demand, the government's implied duty of good faith and fair dealing may require it to inform the contractor of such changes, and to officially update the estimate to better reflect the changed requirements." *Datalect I*, 40 Fed.Cl. at 37 n. 8 (citing *Celeron Gathering Corp. v. United States*, 34 Fed.Cl. 745, 752–53 (1996)).[8]

The court in *Datalect I* then examined whether the Army breached the contract's requirements clause by failing to use plaintiff exclusively to repair and maintain Tier–III equipment purchased after the contract was

8. Although the court did not predicate its holding on the *Celeron* decision, this footnote contained the seeds that germinated into a new theory of liability advocated by plaintiff in its second complaint, filed March 8, 2000, more than two years after the *Datalect I* opinion issued. *See infra* note 14.

awarded to plaintiff.[9] Observing that the clause obligated the Army to order all services or supplies from plaintiff that were "required to be purchased," the court construed the clause narrowly in determining that the Army's use of in-house maintenance and warranties attached to new computers did not violate the requirements clause. *Datalect I*, 40 Fed.Cl. at 39–41. The contract required the Army to engage plaintiff only when it was necessary to purchase the service at issue, rather than every time that it needed a repair performed on new Tier–III equipment. If the required service happened to be covered by an extended warranty, or if it could be completed by Army technicians, the contract did not require the Army to purchase the repair and thus, to utilize plaintiff. Accordingly, the court concluded that the Army had not breached the contract by utilizing inside and outside maintenance services on new Tier–III equipment.[10]

Sr. Judge Tidwell held a trial in order to assess the proper amount of plaintiff's recovery for the Army's negligent estimates. *See generally Datalect II*, 41 Fed.Cl. 720. Plaintiff advocated two theories of recovery: 1) reformation and 2) increased costs, based upon a formula articulated in *In re Wheeler Bros.*, 79–1 B.C.A. (CCH) ¶ 13,642, 1979 WL 2448 (No. 20465). The court held that plaintiff had failed to meet its burden under either of these theories, *Datalect II*, 41 Fed.Cl. at 725–26, 728, in that plaintiff had "failed to establish the reasonableness of the claimed damages and their causal connection to defendant's negligence," *id.* at 728. The court also considered whether the jury verdict method could support an award, but rejected it due to plaintiff's failure to justify its CLIN prices. The jury verdict method requires "sufficient evidence to make a reasonable approximation of the damages incurred," and plaintiff's evidence did not satisfy this standard. *Id.*

Plaintiff appealed both *Datalect I* and *Datalect II*. The Federal Circuit issued an unpublished opinion affirming-in-part, vacating-in-part, and remanding. *See generally Datalect III*, 1999 WL 507144, 1999 U.S.App. LEXIS 15985. The appeals court affirmed the conclusion that the Army's in-house maintenance of its computer equipment did not contravene the contract's requirements clause. *Id.* at *12. However, the Federal Circuit disagreed with the trial court's conclusion on the Army's exploitation of warranties. Reasoning that the trial court's interpretation of the "required to be purchased" language from the requirements clause would allow the Army to bypass plaintiff by "purchasing lengthy warranties with its computer equipment," the Federal Circuit ruled that, absent a showing that the parties intended a restrictive definition, "the trial court's interpretation of 'purchase' is too narrow." *Id.* at *13.

The Federal Circuit noted the parties' divergent interpretations of the scope of the requirements clause. Defendant advocated that the parties intended to exempt equipment under warranty from the requirements clause because a reasonable contractor would not expect the Army to pay for a service that it could receive for free under warranty. Defendant also pointed to plaintiff's promise, in its proposal, to " 'negotiate a practical solution to failed equipment still under warranty.' " *Datalect III*, 1999 WL 507144, at *5, 1999 U.S.App. LEXIS 15985, at *14. Plaintiff countered that the language from the proposal concerned only pre-existing warranties and that the Army had run afoul of the requirements clause by obtaining new warranties or by extending pre-existing warranties. *Id.* at *5, 1999 U.S.App. LEXIS 15985, at *15. Because these arguments hinged on the parties' intent regarding the scope of the requirements clause, the Federal Circuit directed the trial court to explore these issues on remand. *Id.*

---

9. The court's analysis applied only to the Army's exploitation of warranties attached to computers purchased after the execution of the contract. *Datalect I*, 40 Fed.Cl. at 38 n. 9.

10. The court also denied defendant's motion for summary judgment as to damages, finding that the measure of plaintiff's damages due to the negligent estimates was in dispute. *Datalect I*, 40 Fed.Cl. at 41.

The Federal Circuit also ruled that plaintiff had raised a disputed factual issue as "to whether the Army purchased warranties under which it procured maintenance services during its contract with [plaintiff]." *Datalect III*, 1999 WL 507144, at *6, 1999 U.S.App. LEXIS 15985, at *16. Plaintiff argued that the Army separately had negotiated and purchased warranty coverage on computers covered by the contract, identifying a specific contract whereby the Army had paid for an initial period of warranty coverage and had received several extensions thereto.[11] *Id.* at *5–6, 1999 U.S.App. LEXIS 15985, at *15–16. The Federal Circuit instructed that, in the absence of evidence establishing a contrary intent by the parties, the "required to be purchased" language "includes maintenance that is performed by third parties under a warranty purchased by the government." *Id.*

Turning to damages, the Federal Circuit upheld the trial court's determination that the "flaws in [plaintiff's] proof of damages went beyond lack of mathematical precision." *Datalect III*, 1999 WL 507144, at *6, 1999 U.S.App. LEXIS 15985, at *17. Because plaintiff's "damages evidence was not sufficiently related to the only beach at issue, the government's negligent estimates," *id.* at *6, 1999 U.S.App. LEXIS 15985, at *17, the trial court properly refused to award plaintiff damages under its reformation or its increased costs theory, as articulated in *Wheeler*. *Id.* at *6–8, 1999 U.S.App. LEXIS 15985, at *17–21.

Plaintiff filed a second complaint, No. 00–120C, on March 8, 2000, which addressed only the final three option periods of the contract, *i.e.*, March 1995 to July 1997. The complaint followed Mr. Fattal's December 8, 1998 claim letter under the CDA for damages that plaintiff absorbed during the final three option periods of the contract.[12]

Plaintiff claimed that the Army was aware of several factors that would likely affect its repair needs during the life of the contract, yet the Army failed to disclose these factors to plaintiff. The Army's use of personnel other than plaintiff to service equipment covered by the contract placed the Army in breach. Finally, the claim cited the Army's contract, presumably with EDS, "for warranty maintenance on newly purchased computer equipment that provided three and in some cases five years of maintenance on the equipment after it was purchased." These actions warranted an equitable adjustment of DM 6,394,348.00.

Mr. Demetroulis denied plaintiff's claim on March 25, 1999. Citing *Datalect II*, Mr. Demetroulis criticized plaintiff for grounding its damages claim in a method previously found to be judicially insufficient. Further, he quoted from the portion of *Datalect II* ruling that the Army did not breach the requirements clause by performing in-house maintenance or exploiting extended warranty service.[13]

Plaintiff's new complaint essentially alleged that the Army failed to update the call volume estimates, that it breached its duty of good faith and fair dealing by submitting the negligent estimates as part of the solicitation,[14] and that it breached the contract by

---

11. The parties acknowledged during the second trial that the "specific contract" to which plaintiff referred in its argument was the EDS contract.

12. Mr. Silverman testified that, after being rehired by plaintiff in 1998 as its Financial Director, he "put together the basis" of this claim. Tr. 1375.

13. The portion of *Datalect* II concerning the use of extended warranty service was vacated by the Federal Circuit in *Datalect III*. Mr. Demetroulis's March 25, 1999 denial of plaintiff's claim predated *Datalect III*.

14. The basis for plaintiff's claim for breach of duty of good faith and fair dealing is *Celeron*, 34

Fed.Cl. 745. In its September 27, 2002 order denying plaintiff's motion for summary judgment on this issue, the court distinguished *Celeron* from the case at bar, noting that the case "stands for the proposition that failure to disclose knowledge of a severe decrease in calls would constitute a breach of the Government's duty of fair dealing." *Datalect v. United States*, Nos. 95–328C & 00–120C (Fed.Cl. Sept. 27, 2002), at 9 (unpubl.). Plaintiff's claim is that the breach was the Army's failure to revise the estimates or to terminate the contract, a situation not addressed in *Celeron*. Assuming, *arguendo*, that such a duty existed, which the court does not find, plaintiff did not establish that its damages would differ from proof of lost profits under its reformation theory.

purchasing "Tier–III maintenance services under the guise of extended warranties." Compl. filed Mar. 8, 2000, ¶ 122. This complaint was consolidated with the original complaint, No. 95–328C, by order entered on July 20, 2000. On February 14, 2002, these cases were transferred to the undersigned.

Plaintiff moved for partial summary judgment on its claim for breach of duty of good faith and fair dealing, and defendant cross-moved for summary judgment complete. In its order of September 27, 2002, this court upheld subject matter jurisdiction over plaintiff's good faith and fair dealing claim, but reserved for trial whether the scope of the requirements contract included service calls on all equipment carrying warranties and whether the Army purchased extended warranties. The court granted defendant's motion, but only insofar as both parties agreed that plaintiff had not alleged that the Army separately negotiated and purchased extended warranty service; instead, plaintiff's claim was construed as alleging that the Army diverted warranty calls from plaintiff when the Army bought new hardware and received warranties from the same vendor, thereby "purchasing" extended warranty service through the price of new computers.

## DISCUSSION

The Federal Circuit opinion in *Datalect III* addressed the complaint in No. 95–328C, which was restricted to the period of March 1993 to March 1995, the initial contract period of one year, plus the first contract option year. Plaintiff's second complaint, No. 00–120C, involved the period from March 1995 to July 1997, the last two-plus years of plaintiff's contract. Therefore, the trial on remand addressed three issues: 1) the damages that plaintiff incurred, if any, during the last two years of the contract due to the Army's estimates that the Federal Circuit affirmed were negligent; 2) the alleged breach of the Datalect contract's requirements clause by the Army's utilization of outside maintenance providers to perform

Plaintiff in *Celeron* was awarded the cost of cover, because, unlike the case at bar, *Celeron* involved estimates of oil to be sold to plaintiff that prevented the contractor from fulfilling its contracts to supply refined oil to its customers.

work on machines in their standard warranty period, by its purchase of new hardware with warranty service, and/or by its negotiation of extended warranties from Tier–III equipment vendors; and 3) the damages that plaintiff incurred, if any, during the life of the contract, owing to the propriety of the Army's use of warranties.

### I. *Damages for negligent estimates*

Plaintiff presents two alternative calculations regarding its damages for negligent estimates: 1) reformation and 2) total loss. Although plaintiff's post-trial submissions did not propose findings on the total loss claim, focusing instead on the reformation claim supported by Mr. Watts's testimony, the court will address both theories of liability.

#### 1. *Reformation*

■ Because the Federal Circuit in *Datalect III* upheld the trial court's finding that plaintiff's proof of damages was insufficient, plaintiff is restricted to seeking damages based on the Army's negligent estimates for the last two years of its contract, which are the subject of plaintiff's later-filed complaint.

Plaintiff seeks a price adjustment for the third and fourth option years based on the prices that it submitted in its BAFO for those years. If the call estimates had been calculated properly, plaintiff asserts that it would have submitted higher prices for each CLIN in order to compensate for the low call volume. Plaintiff essentially presents a reformation measure of damages: the difference between the CLIN prices that it actually submitted and the CLIN prices that it would have submitted if the Army accurately had estimated the maintenance call volume. Because the prior rulings do not foreclose plaintiff's proof of damages with respect to the later years, except insofar as the evidence is found to suffer the same inadequacies, the court tried *de novo* both plaintiff's claim for damages based on negligent estimates and its warranty claim.

Plaintiff was forced to purchase oil at a higher price and was able, unlike this plaintiff, to quantify its damages to the court's satisfaction. *See Celeron*, 34 Fed.Cl. at 754–55.

After determining that the Army had prepared its estimates negligently, Sr. Judge Tidwell rejected plaintiff's attempts to quantify its losses under a reformation theory. *Datalect II*, 41 Fed.Cl. at 725. First, plaintiff provided no credible validation for the method used to formulate its original and revised CLIN prices. *See id.* at 725–26. Plaintiff did not put its databases into evidence, and the court deemed the cashflow statement as providing little support for plaintiff's original CLIN prices. Plaintiff employed a universal CLIN price adjustment when formulating its revised CLIN figures, but it "provided no support for its assumption that proper disclosure of the government's requirements would have a uniform impact on all CLIN bid prices." *Id.* at 726.

Second, the "touchstone" of the reformation theory was plaintiff's assumption that, armed with the knowledge that self-maintenance, extended warranties, and a troop drawdown might reduce the need for maintenance calls, it would have projected a reduction in call volume of 50% from the FY 1991 call figures used as a basis for the Army's estimates. *Datalect II*, 41 Fed.Cl. at 726. However, plaintiff failed to support this assumption, as it admitted that it seized on this figure only in hindsight; nor was the figure supported by the testimony of Mr. Watts, the absent witness who formulated the original proposal, or that of an expert. *Id.*

Third, plaintiff used the prices in its proposal as the baseline upon which it grounded its reformation theory, yet Sr. Judge Tidwell concluded that the CLIN prices reflected in plaintiff's BAFO were the logical starting point for the reformation analysis. *Datalect II*, 41 Fed.Cl. at 726. Mr. Fattal, plaintiff's Chairman, testified that the revised CLIN prices in the BAFO reflected the Army's revision of the minimum order requirement from $250.00 to $1.00. In formulating its original CLIN prices, plaintiff assumed that the Army would perform maintenance tasks costing less than $250.00; when the minimum order threshold was dropped subsequent to its proposal, plaintiff believed that it would receive virtually all maintenance calls, thereby enabling plaintiff, according to Mr. Fattal, drastically to reduce the CLIN prices in its BAFO. Consequently, adjusting the original CLIN prices to reflect what plaintiff would have done had it known of the Army's promotion and performance of self-maintenance was somewhat redundant, because plaintiff had calculated its revised CLIN prices with this factor in mind. *Id.* at 726.

Fourth, and finally, defendant successfully impeached Mr. Fattal's credibility regarding the technical aspects of plaintiff's proposal preparation. *Datalect II*, 41 Fed.Cl. at 726–27. Mr. Fattal devised the numerical predicates upon which plaintiff grounded its reformation claim, and then an accountant developed the numbers based on Mr. Fattal's assumptions. The court found that Mr. Fattal, however, "had no technical familiarity with computer repair or bid preparation," lacked familiarity with plaintiff's day-to-day operations, and conceded that Mr. Watts would be more knowledgeable regarding the methods behind the prices in plaintiff's initial proposal. *Id.* at 726–27.

The Federal Circuit affirmed Sr. Judge Tidwell's rejection of plaintiff's reformation theory. *Datalect III*, 1999 WL 507144, at *6–7, 1999 U.S.App. LEXIS 15985, at *18–*19. In order for the damages claimed to be related to the breach, plaintiff must present the prices that it would have submitted had the estimate not been negligently prepared. However, plaintiff "never produced any evidence as to what estimates the Army would have made if it had not acted negligently." *Id.* at *6, 1999 U.S.App. LEXIS 15985, at *18. Even if plaintiff had proven the Army's hypothetical estimates with the requisite specificity, it "failed to show that its damages were the necessary result of the Army's breach." *Id.* Each of plaintiff's witnesses who testified about plaintiff's hypothetical CLIN prices admitted that plaintiff calculated those prices "based in part on factors unrelated to the breach found by the trial court," *id.,* including an assumption that the Army would disclose the mix of "easy" and "hard" calls in the estimates, *id.* at *7, 1999 U.S.App. LEXIS 15985, at *19. Acknowledging that the estimates did not detail such a mix, one of plaintiff's witnesses "admitted that the call rate alone was insufficient to

determine the profitability of the contract." *Id.*

To succeed on its reformation claim in the second trial, plaintiff was required to prove by a preponderance of the evidence both the hypothetical non-negligent call estimates that the Army would have presented, as well as the CLIN prices that plaintiff would have submitted in its proposal in response to the revised estimates. At this trial plaintiff presented the testimony of Mr. Watts, who supervised the formulation of the figures in plaintiff's proposal and its BAFO. The court finds Mr. Watts's testimony credible, but diminished by a flawed methodology. Mr. Watts did not appear at the earlier trial because he was hospitalized for chronic migraine headaches; moreover, he sued plaintiff in 1996 and no longer worked for, or had an ownership interest in, plaintiff by the end of 1997.

Mr. Watts prepared a report for this trial that includes his calculation of plaintiff's reformation claim. *See* Amended Report of Peter J. Watts ¶¶ 18–19.2 ("Watts Rpt.").[15] In order to calculate the Army's hypothetical, non-negligent call estimates, Mr. Watts assumed that the Army would have based the revised estimates on the calls actually received in 1993–94 under the Datalect contract; he grounds this assumption in the fact that the Army used the calls placed to Sorbus, the Army's previous Tier–III contractor, during FY 1991 when estimating the call volume for the Datalect contract. Mr. Watts then reduced this figure by 5%, as he understood that the Army "normally discounted calls" for subsequent option years and arrived at a figure of 7,428 calls. Tr. 319. He estimated that this number of calls would be received both in the third and fourth option years of the contract.

Mr. Watts next calculated plaintiff's costs for year three of the contract based on the costs allegedly incurred by plaintiff while performing the contract during the first option year, as adjusted for "inflationary increases and that sort of thing." Tr. 319. He further adjusted the costs for the final contractual year.[16] Then he added plaintiff's predicted costs to a 15% annual profit, and divided that sum by the Army's revised estimates. This calculation yielded an average income per call of DM 590.00.

Unlike the reformation calculation advanced in *Datalect II*, Mr. Watts adjusted the individual CLIN prices included in plaintiff's hypothetical BAFO after obtaining the DM 590.00 average per call. If plaintiff had not received any maintenance calls for a particular CLIN, Mr. Watts did not adjust that CLIN price, as these types of calls likely would not produce much revenue in the future. Conversely, for CLINs that constituted a higher proportion of the total booked calls, Mr. Watts looked at the types of parts involved and the time required for an engineer to complete such repairs when adjusting the CLIN price upward. For example, for laser printers and scanners, covered under CLIN 01AE, Mr. Watts adjusted the CLIN price from DM 425.00 per call to DM 810.00 per call, because plaintiff had received a large number of service calls for these machines.

Mr. Watts's revised CLIN prices, if they had been accepted by the Army, would net DM 8,765,040.00 in sales during the final two contract years. After subtracting the DM 5,210,206.00 that plaintiff actually received under its contract during the last two option years, plaintiff's reformation claim totals DM 3,554,834.00.

Plaintiff advocates that its reformation theory is appropriate because the Army "was

---

**15.** Mr. Watts's report does not indicate on which date it was prepared, although defense counsel argued that portions of the report were revised the week before trial.

**16.** Deficiencies are apparent in Mr. Watts's cost figures. Mr. Watts allocated a cost of DM 65,-000.00 to office furniture for year four of the contract, but admitted at trial that this figure should be DM 6,500.00, the cost associated with office furniture from year three of the contract.

Although the court believes Mr. Watts's testimony that he did not intentionally add to plaintiff's reformation claim, this mistake inflated plaintiff's costs and thus increased the claim. Next, Mr. Watts testified that he revised some of his cost figures the week before trial after receiving the report of John R. Wilding, discussed *infra* section I.2. The court does not find Mr. Wilding's cost allocations reasonable, which renders Mr. Watts's cost figures even more suspect.

taking advantage of the negligently prepared estimates and the change in status quo" when it exercised the last two option years. Pl.'s Br. filed Dec. 17, 2002, ¶ 19. It analogizes this situation to the Government's acceptance of a bid or proposal containing a mistake, citing *Bromley Contracting Co. v. United States*, 219 Ct.Cl. 517, 596 F.2d 448 (1979).[17] Plaintiff reads the Federal Circuit's recent decision in *Rumsfeld v. Applied Companies, Inc.*, 325 F.3d 1328 (Fed.Cir.2003),[18] to mandate an equitable adjustment to compensate for the negligent estimates.

Defendant counters, first, that an essential predicate to plaintiff's reformation claim is absent—the duty of the Army to terminate plaintiff's contract and re-open it for proposals.[19] Plaintiff never specifically requested a renegotiation of the CLIN prices, nor did plaintiff ask the Army to terminate the contract before exercising the last two option years. Defendant also faults plaintiff for presenting no case law that would require a government entity to terminate a requirements contract; however, defendant submits no case law to support its argument that plaintiff's decision not to request renegotiation of its CLIN prices prevents plaintiff from recovering negligent estimates damages. After Mr. Demetroulis's July 18, 1994

letter informed plaintiff that "future estimates of call rates will be revised to reflect the new status quo," the Army was not under a legal obligation to cancel the contract and recalculate the call estimates, although plaintiff reasonably could have viewed this statement as obviating the need to make a request for a revised call estimate. Speculation will not save the argument for plaintiff, but the court finds that its hesitancy to press the Army was attributable to plaintiff's desire to avoid offending protocol in dealing with a new customer.

Second, defendant faults Mr. Watts's reformation calculation "because it contains absolutely no nexus between the total costs that Mr. Watts was assuming and the CLIN prices he depicts." Def.'s Br. filed Feb. 10, 2003, at 4. Defendant argues that plaintiff's evidence does not supply the necessary support for the recalculated CLIN prices based on a response to non-negligent estimates.

Throughout the trial, defendant emphasized plaintiff's destruction of the bid notes that Mr. Watts and his colleagues used to formulate the CLIN prices submitted in plaintiff's proposal and BAFO. Mr. Watts testified that the notes generated when pre-

---

**17.** Plaintiff has not shown how its case parallels *Bromley*. In *Bromley* plaintiff contractor sought reformation after the Government refused to allow it to correct its mistaken bid. In the instant case, plaintiff did not submit a proposal containing a mistake; rather, it relied on the estimates, later proved to be negligent, supplied by the Army. If anything, the Army has committed the "mistake" at issue, but this fact alone does not justify reformation of the contract. *See infra* note 19.

**18.** The Federal Circuit originally issued *Applied Companies* on December 10, 2002, and plaintiff cited the case in its December 17, 2002 brief. The Federal Circuit subsequently withdrew the opinion on April 2, 2003, replacing it with an opinion correcting factual errors. *See Applied Companies*, 325 F.3d at 1330. The Federal Circuit did not alter its damages analysis in the corrected opinion. Although it usually employs the LEXIS citation when referring to unpublished opinions, this court will use the WestLaw citation for *Applied Companies* because, as of the date of this opinion, LEXIS had not reflected the changes in the re-issued opinion.

**19.** Defendant dismisses the testimony of Patricia A. Neal, Contracting Officer, who delegated responsibility to 5th Signal for administering the Datalect contract. Her concessions were extraordinary. Ms. Neal testified by deposition that, when faced with a 48–50% deviation from the original quantity estimates, the contracting officer should advise the contractor that if the estimates remain that low, "by the end of the year … it would not be feasible for the government to exercise the option." Deposition of Patricia A. Neal, July 18, 2001, at 36–37. Ms. Neal also testified that a 50% deviation from the Army's estimates was not reasonable. *Id.* at 35–36. In response to a question hypothesizing a "great" deviation, caused by the Army's negligent estimates, she stated: "Well, then we cannot in clear conscience exercise the option-to-extend the contract another year." *Id.* at 55.

Although this testimony bears only on liability for negligent estimates, which has been established, this is a resounding *mea culpa*. Defendant is correct that the Army was not free to relieve plaintiff of its contract requirements by repudiating them. At the same time, the Army had the right and power not to exercise options, especially after admitting that the estimates were off by almost 50%.

paring these documents were stored in his and his secretary's offices. When he was dismissed, his office was cleaned out and the notes presumably were destroyed, as plaintiff was unable to present them at trial. Some of the notes were electronic and stored on Mr. McKellar's computer, but these were lost when Mr. McKellar's computer crashed on an unspecified date.

Defense counsel denominated the date of the documents' destruction as the day "when [plaintiff's] case died." Tr. 1957. The court is mindful of the importance of bid notes in providing a basis for plaintiff's damages claim, *see Skip Kirchdorfer, Inc. v. United States*, 14 Cl.Ct. 594, 607 (1988); *see also Datalect III*, 2003 WL 1733711, at *6–7, 1999 U.S.App. LEXIS 15985, at *18–19, but the cultural differences manifested by the parties' conduct in this case contributed to plaintiff's belief that such documentation was unnecessary. While lack of familiarity with legal requirements for contracting with the U.S. Government does not disable defendant's argument, it does mitigate its effect. Therefore, while the court does not view plaintiff's inability to produce its bid documents as fatal to its claim, plaintiff's inability to account for their destruction does contribute to the speculative nature of plaintiff's reformation theory.[20]

Defendant points to testimony indicating that plaintiff's employees, when formulating plaintiff's proposal and BAFO, did so under the assumption that plaintiff would receive almost all the estimated volume of calls. Mr. Watts characterized the Army's estimates as the "key figure" in determining what prices plaintiff should include in its proposal. Tr. 140. He believed that Amendment 0002 to the solicitation—whereby the Army indicated that all equipment purchased by 5th Signal during the life of the contract would be serviced by the Tier–III contractor—made the Army's estimates "solid." Tr. 136. Indeed,

Mr. Watts was of the view that the Tier–III contractor eventually would receive more calls than the 17,000 annual calls indicated by the estimates.

The court begins with paragraph 10.3.2 of plaintiff's proposal, which indicated that plaintiff calculated its spare parts costs based on the 17,000 call figure. Mr. Watts testified that a 5% variance from the call estimates "would be acceptable within our bid," Tr. 681, but refused to speculate whether a larger deviation would have rendered the contract unprofitable for plaintiff. In a similar fashion, plaintiff constructed the BAFO "CLIN prices ... based upon 17,000 calls a year with a cost ...." Tr. 683.

Plaintiff's employees understood that the Army could not guarantee that plaintiff would receive the full amount of the estimated calls, yet Mr. Watts and his subordinates hinged the figures in their proposal and BAFO on receiving almost all of these estimates. Given plaintiff's familiarity with requirements clauses, allowing only a 5% deviation was not reasonable under the circumstances. "Contract estimates are 'not guarantees or warranties of quantity.'" *Applied Companies*, 325 F.3d at 1339 (quoting *Shader Contractors, Inc. v. United States*, 149 Ct.Cl. 535, 276 F.2d 1, 7 (1960)).

The testimony of Mr. Phillips, plaintiff's Major Account Sales Manager at the time of plaintiff's proposal and a credible witness, was revelatory about plaintiff's process in formulating the CLINs in its BAFO. The cover page to plaintiff's BAFO attributed the roughly 40% drop in prices between plaintiff's proposal and BAFO to the reduction of the minimum delivery order threshold from $250.00 to $1.00. It also indicated that this reduction allowed plaintiff "to revert to its usual pricing policy and submit a tariff more in line with its major UK customers."

---

**20.** Plaintiff's reading of *Applied Companies*, 325 F.3d 1328, to provide for a recovery based on actual increased costs without regard to bid documents is misplaced. While the *Applied Companies* court did affirm a finding of liability for the Government's negligent estimates in the context of a requirements contract, it remanded for the determination of damages, noting that, if plaintiff

had delivered any cylinders under its contract with the Department of Defense, plaintiff should have an opportunity to prove that it was entitled to an equitable adjustment. 325 F.3d at 1344. However, if plaintiff had not delivered any cylinders, its recourse was limited to the termination for convenience clause of the contract. *Id.* at 1342. The decision does not address the necessi-

Mr. Phillips, who assisted plaintiff in constructing the BAFO, characterized this language as "flowery," "not written to be picked apart word by word by a [c]ourt of [l]aw," and part of the overall "sales letter." Tr. 1590–91. He also admitted that plaintiff did not have another contract which was comparable to the Datalect contract and that plaintiff's statement regarding its ability to submit a tariff in line with that charged to its UK customers was "a piece of sales fluff." Tr. 1594. According to Mr. Phillips, the CLIN prices were not the product of a detailed analysis; rather, Mr. Johnson suggested by how much plaintiff should reduce its overall BAFO price, and plaintiff's employees then conformed the CLINs to achieve Mr. Johnson's desired reduction.[21]

Defendant successfully impugned the reliability of the United Kingdom database, which was consulted by plaintiff's employees when formulating the BAFO CLIN prices. Mr. Silverman, who served as financial director for both CityLink and plaintiff at various points in the 1990s, testified that the database was not reliable in determining parts and overhead costs. The database would "double, treble, and quadruple" count parts costs as requisitions were placed. Tr. 1378–79. He characterized the United Kingdom database as being useful only for invoicing and monitoring whether an engineer was available for a maintenance call.

In *Datalect II* Sr. Judge Tidwell faulted plaintiff for not producing Mr. Watts as a witness and for not grounding its reformation claim on plaintiff's BAFO. Mr. Watts testified at this trial, and he has calculated the reformation claim based on the revised CLINs that plaintiff would have submitted in response to non-negligent estimates. Even with the assistance of Mr. Watts, plaintiff was not able to satisfy the Federal Circuit's statement of controlling law that plaintiff must show that "its damages were the necessary result of the Army's breach." *Datalect III*, 1999 WL 507144, at *6, 1999 U.S.App. LEXIS 15985, at *18. Mr. Watts's reforma-

tion analysis contained both obvious errors and relied upon Mr. Wilding's cost allocation, discussed below, that the court cannot credit. Plaintiff was unable to produce the bid notes relating to its original BAFO and CLIN prices. Defendant elicited testimony from Mr. Watts that plaintiff unreasonably hinged the profitability of its BAFO on receiving almost all the calls presented in the Army's estimate, and Mr. Phillips testified that the figures in plaintiff's BAFO were not the result of a plausible analysis. Mr. Silverman counseled that the United Kingdom database was an unreliable source of data.

Because plaintiff has not proved that its damages were the result of the Army's breach, plaintiff·cannot recover under a reformation theory.

### 2. *Total loss claim*

■ As an alternative to its reformation claim, plaintiff submits a claim for the losses under the last two-plus years of the contract as a reasonable measure of its damages stemming from the Army's negligent estimates. This claim resembles a total cost claim, a method whereby damages are measured by the difference between the actual cost of performing the contract and the costs estimated in the contractor's proposal. *WRB Corp. v. United States*, 183 Ct.Cl. 409, 426, 1968 WL 9146 (1968). Determining damages by total loss "has always been viewed with disfavor, in part because of concerns about bidding inaccuracies ... and performance inefficiencies ...." *Raytheon Co. v. White*, 305 F.3d 1354, 1365 (Fed.Cir.2002).

In *Datalect II* plaintiff pressed an "increased cost" claim calculation. Plaintiff's expert premised this claim on the formula used in *In re Wheeler Bros.*, 79–1 B.C.A. (CCH) ¶ 13,642, and applied iterations of this formula to plaintiff's fixed costs, spare parts costs, and the profit margin on those costs in order to obtain an equitable adjustment for each figure. He then totaled the three equitable adjustments to calculate plaintiff's total

---

ty of providing bid documents to substantiate the calculation of a claim.

**21.** Mr. Silverman's testimony also draws into the question the reliability of the revised cashflow statement as an accurate portrayal of the calculations used to structure plaintiff's BAFO CLIN

prices. Mr. Silverman testified that the document was not "exactly the final bid;" instead, it was "the closest thing that [plaintiff] could actually find to the time when the BAFO went in" and that "it's awfully close to the figuring that went on at the time." Tr. 1452.

losses resulting from the reduced call volume.

Sr. Judge Tidwell noted several problems with plaintiff's increased cost calculation, foremost among them "the classification of several costs as 'fixed costs' and the lack of evidence supporting plaintiff's original CLIN prices." *Datalect II*, 41 Fed.Cl. at 727. Plaintiff's expert admitted that he did not know whether plaintiff's costs were classified correctly as fixed or variable, because plaintiff's employees had determined how to characterize each cost. Moreover, plaintiff provided little evidence on how it prepared its proposal. Noting that plaintiff "did not provide the court with contemporaneous evidence of the projected call volume, anticipated costs, or price calculations used in the preparation of [plaintiff's proposal]," Sr. Judge Tidwell found that the "increased cost claim calculation does not provide a reasonable basis for computing plaintiff's damages." *Id.* at 728.

Although plaintiff disavows pursuing a *Wheeler* formulation of damages at this trial, the court finds that plaintiff's total loss claim fails for the same reason as its "increased cost" claim—plaintiff's inability to prove its costs with sufficient specificity. Plaintiff relies on the report of John R. Wilding, a chartered accountant (a British position similar to that of a certified public accountant) and founding member of Wilding, Hudson & Co. Chartered Accountants ("Wilding & Co."). Plaintiff charged Mr. Wilding's firm with calculating Datalect GmBH's losses on the contract during the last two-plus years of the contract.

Anne C. Larsen, a chartered accountant and a manager at Wilding & Co., and plaintiff's expert in accounting and the preparation of financial reports, performed the numerical analyses in Mr. Wilding's report, although he reviewed her work and signed the report. In preparing the report, she reviewed plaintiff's "books and records," Tr. 1156, including the monthly accounts and trial balances, payroll records, and sales invoices. She also spoke with

Messrs. Watts, Fattal, and Silverman and relied on a summary of the revised cash-flow statement that plaintiff allegedly formulated when calculating its BAFO.

Ms. Larsen concluded that plaintiff lost DM 2,342,745.00 between March 1, 1995, and June 30, 1997, approximately the last two-plus years of the contract, and that DM 2,065,556.00 was attributable to the Datalect contract. In arriving at this figure, Ms. Larsen separated the costs allocable to the Army from those allocable to plaintiff's non-Army work.[22] The costs were obtained from plaintiff's books, which were kept on a calendar-year basis; consequently, Ms. Larsen regrouped the costs to correlate with the Datalect contract years, in which performance ran from March to March. She then took into account the amount of depreciation on fixed assets and totaled the costs and her depreciation adjustments to arrive at a yearly figure to reflect plaintiff's losses.

Although finding Ms. Larsen to be a thoughtful, careful witness, the court lacks sufficient confidence in her methods of allocating plaintiff's costs. Under the rubric established in *Datalect III*, absent plausible justification for the absence of records, plaintiff must show the CLIN amounts that it would have included in its BAFO in response to the Army's recalculated call estimates. A necessary predicate for this showing would be the costs that plaintiff would incur in performing the contract.

David L. Cotton, a defense witness and certified public accountant, analyzed the report submitted by Mr. Wilding and concluded that the report overstated plaintiff's losses during the last two-plus years of the contract. Mr. Cotton placed plaintiff's total losses on the Datalect contract at DM 909,966.00. He based his opinion on his work as an expert for defendant in *Datalect I* and *II*, by reading plaintiff's expert reports, by attending various depositions, and by reviewing documents housed in plaintiff's headquarters in 1998.

---

22. Ms. Larsen could not consult plaintiff's method of allocating costs between Army and non-Army work, because, as Mr. Silverman testified, plaintiff kept "no records in that detail reliable enough to do that exercise." Tr. 1422.

Mr. Cotton testified that neither Ms. Larsen's allocation of costs, as reflected in Mr. Wilding's report, nor the costs contained in Mr. Watts's report, conformed with generally accepted accounting principles ("GAAP"). However, Ms. Larsen testified that her report conformed with the British equivalent of GAAP and that there was little difference between the two systems. Given Ms. Larsen's and Mr. Watt's approach as British nationals, Mr. Cotton's assertion is not determinative.

Mr. Cotton also disagreed with Ms. Larsen's allocation of costs between the Army and non-Army work and performed his own allocation in response. According to Mr. Cotton, Ms. Larsen allocated certain costs based only on the numbers in plaintiff's BAFO, not on plaintiff's actual performance of the contract. For example, when allocating payroll costs, Ms. Larsen developed a ratio reflecting the number of contract personnel estimated in plaintiff's BAFO compared with the number actually employed in a certain year. She then allocated payroll costs in accordance with the ratio, not based on the number of employees actually assigned to the Datalect contract.

The court agrees with Mr. Cotton's testimony that such a method of allocation is particularly problematic, as it assumes the accuracy of plaintiff's BAFO, which, as discussed above, was not the result of a reasoned analysis and was predicated on the incorrect calculations in the database. Also, in light of Mr. Watts's testimony that plaintiff's employees viewed the Army's estimates, which proved to be negligent, as the lynchpin of plaintiff's proposal and BAFO, it is highly unlikely that plaintiff actually employed the number of engineers for the contract that it proposed to employ in its BAFO.

Ms. Larsen also allocated certain costs solely to plaintiff's Army work, including main office costs, electricity and heating, and security costs, even though plaintiff was performing non-Army work during the last two-plus years of the contract. She allocated other costs—including engineers' cars, office furniture, and recruitment fees—to the Army based on a "norm" that she extrapolated from the costs of these expenditures from the 1994–95 contract year. Although the court finds that plaintiff responsibly and reasonably attempted to develop non-Army business after it set up support centers to work on the Datalect contract in Germany, Ms. Larsen's allocation did not track any meaningful separation of the work.

Plaintiff predictably takes issue with Mr. Cotton's allocation of plaintiff's Army and non-Army costs; however, plaintiff's counsel indicated during closing arguments that the court could use Mr. Cotton's figure if it did not have faith in Ms. Larsen's calculations. Mr. Cotton calculated an incurred loss for plaintiff of DM 909,966.00 during the last two-plus years of the contract. Although the court appreciates that Mr. Cotton did not testify to damages that defendant is prepared to accept and was providing a different result to undermine Ms. Larsen's analysis, the court has considered using Mr. Cotton's calculation in applying a jury verdict method of quantifying plaintiff's total losses under the Datalect contract.

"Before resorting to the jury verdict method, a court . . . must determine (1) that clear proof of injury exists; (2) that there is no more reliable method for calculating damages; and (3) that the evidence is sufficient to make a fair and reasonable approximation of the damages." *Raytheon*, 305 F.3d at 1367 (citing *WRB Corp.*, 183 Ct.Cl. at 425, 1968 WL 9146). "'In estimating damages, the Court of Claims occupies the position of a jury under like circumstances; and all that the litigants have any right to expect is the exercise of the court's best judgment upon the basis of the evidence provided by the parties.'" *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1357 (Fed.Cir. 2001) (quoting *Specialty Assembling & Packing Co. v. United States*, 174 Ct.Cl. 153, 355 F.2d 554, 572 (1966) (citing *United States v. Smith*, 94 U.S. 214, 219, 12 Ct.Cl. 119, 24 L.Ed. 115 (1876))).

The Federal Circuit in *Bluebonnet* addressed a claimant's entitlement to increased financing costs incurred after the passage of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183, which

spawned a pandemic of lawsuits. It was foreseeable that a breach of promised regulatory forbearances would lead to increased financing costs and that the breach was a substantial factor in forcing plaintiff to expend these costs. After satisfying foreseeability and causation, plaintiff attempted to quantify its damages. In discussing the appropriateness of a jury verdict calculation of damages, the court noted that plaintiff had submitted documentation [23] which was "more than sufficient to provide a 'fair and reasonable' basis from which to calculate [its] damages." 266 F.3d at 1357. If plaintiff had not been able to supply this documentation, the " 'amount of the recovery can only be approximated in the format of a "jury verdict" where the claimant can demonstrate a justifiable inability to substantiate the amount of his resultant injury by direct and specific proof.' " *Id.* at 1357–58 (quoting *Joseph Pickard's Sons Co. v. United States,* 209 Ct.Cl. 643, 532 F.2d 739, 742 (1976)).

For plaintiff's total loss claim, plaintiff has shown that it suffered damages as a result of the negligent estimates. However, the burden lies with plaintiff to prove that its inability to quantify the amount of its damages is "justifiable." Plaintiff has not been able to provide a plausible explanation. To prove the amount of its losses under the contract, plaintiff was forced to construct an allocation of costs several years after contract termination, because it did not keep records of which costs were allocable to its Army versus non-Army work. While plaintiff can be granted some leeway, owing to its inexperience with U.S. Government contracts, failing to allocate costs based on the type of work performed makes no business sense on either side of the Atlantic. Moreover, plaintiff has failed to produce any bid notes, the lack of which would render any damages award even more speculative.

The court is convinced that plaintiff made every effort to account for the missing bid documentation, that Mr. Watts was unwavering, and that the cultural differences between this British contractor and the Army explain

more than they excuse. Little doubt exists that plaintiff lost money on the Datalect contract, but plaintiff has provided insufficient evidence upon which to calculate a damages award that is both fair and reasonable. As in *Datalect II,* the court must reject a jury verdict calculation of plaintiff's total loss claim.

## II. *Liability and damages for extension of warranties*

Plaintiff argues that the contract's requirements clause grants it the exclusive right to service machines still in their standard warranty period. Plaintiff also claims entitlement to all the warranty work attached to hardware purchased during the contract, arguing that the Army violated the requirements clause by "purchasing" the maintenance work through the price of the new machines. Plaintiff additionally pleads entitlement to compensation for the Army's negotiation of extended warranties in return for buying Tier–III hardware from EDS.

The Federal Circuit in *Datalect III* remanded two issues related to the Army's procurement and use of extended warranties. First, the appeals court indicated that the "trial court did not assess the intent of the parties" as to the scope of the requirements clause. *Datalect III,* 1999 WL 507144, at *5, 1999 U.S.App. LEXIS 15985, at *13. The Federal Circuit opined that the parties' intent plays an integral role in determining the propriety of the Army's exploitation of warranties. *Id.* at *5, 1999 U.S.App. LEXIS 15985, at *14.

Second, the Federal Circuit concluded that plaintiff "raised a disputed factual issue as to whether the Army purchased warranties under which it procured maintenance services during its contract with [plaintiff]." *Datalect III,* 1999 WL 507144, at *6, 1999 U.S.App. LEXIS 15985, at *16. "[I]n the absence of evidence establishing that the parties intended otherwise, maintenance that is 'required to be purchased' includes maintenance that is performed by third parties under a warranty purchased by the government." *Id.*

---

**23.** Plaintiff provided documentary evidence of a payment made in exchange for long-term loans and an ownership stake in the failing thrift.

Both plaintiff and defendant's experts agreed that this documentation was an appropriate measure of plaintiff's increased costs of financing.

■ This court finds that plaintiff's claim that the contract entitled it to receive the warranty work for machines still within their initial warranty period is belied by plaintiff's actions when submitting its proposal and during contract performance. Plaintiff has made clear from the initial stages of this litigation that it viewed the "required to be purchased" language to encompass standard warranties that came with equipment purchased during the life of its contract. Mr. Watts testified that he understood Question and Answer 26 from Amendment 0002 to the solicitation—which stated that all desktop equipment purchased by 5th Signal will be covered by the contract—as granting plaintiff all warranty work associated with new Tier–III equipment purchased during contract performance. Mr. Watts's testimony regarding paragraph 10.5.6.19 of plaintiff's proposal, in which plaintiff offered to negotiate a "practical solution" for failed equipment still in warranty, is only consistent with plaintiff's understanding, at the time of its proposal, that the Datalect contract did not cover warranty work for machinery purchased before performance began. In fact, plaintiff's counsel echoed this understanding in his representations to the Federal Circuit. *See Datalect III*, 1999 WL 507144, at *6, 1999 U.S.App. LEXIS 15985, at *15.

As defendant proved, plaintiff also performed the contract in a manner that undercuts plaintiff's broad interpretation of the requirements clause. Louis A. Bassie, who worked as a field service technician for plaintiff from 1995 until 1997, testified that his supervisors did not intend for field technicians to work on warranty calls; when they did so, it was with EDS's "permission." Tr. 1532.

In short, plaintiff did not offer testimony which supports plaintiff's theory that the Datalect contract entitled it to all warranty work; rather, plaintiff's employees, after reading Amendment 0002 to the solicitation, formulated a proposal which included an attempt to gain the warranty work which predated the contract. Plaintiff's actions during performance reflect this understanding of the requirements clause. This understanding, in turn, comports with plaintiff's experience in the computer industry and with basic business sense.

■ Turning to plaintiff's claim regarding warranties procured during the life of the contract, the court finds evidence that the Army violated the requirements clause by "purchasing" extensions to warranties on covered machinery.

It is undisputed that the acquisition branch of the Army negotiated a contract with EDS, whereby the Army purchased hardware for a set price and received warranties on that hardware. Through a series of modifications, these warranties repeatedly were extended. The EDS contract was executed on July 27, 1990, and supplied a one-year warranty period for the covered hardware. The initial contract included the first option year, and the Army elected the second option year on September 30, 1991. This extension renewed maintenance service for computer equipment in Europe for one year. The Army exercised the third option year on September 30, 1992, and received from EDS in return an extension until September 30, 1993, on all warranties attached to devices previously purchased under the contract and an extension until September 30, 1994, for warranties attached to certain types of machines.

The contract was extended through the fourth option year on September 30, 1993, and EDS extended all warranties through September 30, 1994. The Army exercised the fifth option year on July 7, 1994. For all products purchased on or before September 30, 1993, EDS extended warranties through July 26, 1995. Products purchased after September 30, 1993, had a two-year warranty attached to them; at the termination of this warranty, EDS would supply mail-in warranty coverage through July 26, 1998. The final modification, executed on March 28, 1995, included a list of equipment which carried two-year on-call warranties. Upon the termination of that service, EDS would supply mail-in warranty coverage through July 28, 1998.

Plaintiff began performance on the Datalect contract on March 8, 1993, and continued performance until July 7, 1997. Thus, under the warranty extensions granted in return

for the Army's election of a fifth option year, if the Army purchased a product after September 30, 1993, it would have no reason to call plaintiff, during the life of the contract, to perform any work covered by that warranty. Mr. Demetroulis testified that the effect of the modifications to the EDS contract was that at least some of the Army's hardware acquisitions during the life of the contract never would be sent to plaintiff for repair. Mr. Selken agreed that the Army's purchase of computers with attached warranties was a "big factor contributing to the drop in calls that [plaintiff] suffered." Tr. 1105.

Mr. Selken, who prepared the answer to Question 26 in Amendment 0002 to the solicitation, maintained that any "computer company with common sense would know that you got warrant[ies] when you buy new equipment." Tr. 1095. Yet, he later admitted that the answer to Question 26 was inaccurate, as its guarantee that "all desk top [sic] equipment" purchased by 5th Signal would be serviced by plaintiff was vitiated by the fact that some of this equipment, owing to the Army's procurement of extended warranties, would never come out of warranty during the life of the contract.

Although aware of the EDS contract when soliciting proposals for plaintiff's contract and when addressing plaintiff's concerns regarding the drop in calls, the Army misled plaintiff about the scope of the EDS contract. Sr. Judge Tidwell previously found that "[i]t was well known in the [Army] ... that purchases and negotiations for new Tier[-]III equipment were occurring both before and during the solicitation for the Datalect contract." *Datalect I*, 40 Fed.Cl. at 33. Despite this knowledge, several government employees disavowed diverting calls to EDS. For example, Mr. Selken's July 12, 1994 letter to plaintiff refused to compensate plaintiff for the Army's self-maintenance "as the Army is not giving any calls to any other contractor." Mr. Demetroulis echoed this sentiment when he indicated, in his July 18, 1994 letter, that the "Government is only precluded from using a different contractor while its contract with [plaintiff] is in effect." He stated in his November 22, 1994 letter to plaintiff that there is "no indication ... that the govern-ment has purchased any of the services covered in the contract schedule from another company." Thus, the Army never gave plaintiff any hint that the Army was siphoning warranty work to a different contractor.

While the court has found that plaintiff's understanding was unreasonable that its contract entitled plaintiff to perform work on computers still in their standard warranty period, plaintiff's claim to the work covered by the extended warranties is established by the actions of both parties during performance of the contract. The Federal Circuit emphasized that the "common understanding of a 'purchase of a service' includes paying in advance for the service to be performed if and when it becomes necessary." *Datalect III*, 1999 WL 507144, at *5, 1999 U.S.App. LEXIS 15985, at *14. The record leaves no doubt that EDS supplied the extended warranty service to the Army as inducement for the election of option years and that the Army purchased hardware under the EDS contract that was covered by this warranty service. Mr. Watts testified that plaintiff was not aware of the EDS contract or its modifications, and nothing in the solicitation process would have alerted plaintiff to the possibility that the Army was purchasing warranty extensions that would prevent plaintiff from operating on some of the machines covered under the Datalect contract.

Defendant makes several attempts to undermine a finding of liability for the Army's extension of warranties. First, it argues that the court cannot credit Mr. Watts's understanding of the requirements clause, as he cannot validate what he understood the clause to mean in 1992–93—the dates of the procurement process for the Datalect contract—because he is unable to produce his bid notes. While the bid notes are significant to a damages calculation, the Federal Circuit ordered an inquiry into the parties' intent regarding the scope of the requirements clause. Mr. Watts, an employee who was fired by plaintiff and who subsequently sued his former employer, was eminently believable on this issue, and the documents on which he relied (*e.g.*, Amendment 0002 to the solicitation and paragraph I.61, the contract's requirements clause) contained no language to

put plaintiff on notice that the Army was entering into a series of warranty extensions while it was soliciting proposals for the Datalect contract.

Second, defendant points to paragraph 10.5.6.19 of plaintiff's proposal, in which plaintiff resolved to "negotiate a practical solution to failed equipment still in warranty. The obvious solution would be for [plaintiff] to handle warranty work on behalf of the manufacturer." Mr. Watts testified that this paragraph referred only to warranties negotiated before the Datalect contract, not those purchased or extended (in return for some form of compensation) during the life of the contract. Mr. Philips testified that the intent behind this paragraph was "to win additional business from the Army." Tr. 1575.

Both Messrs. Demetroulis and Selken, however, testified that various plaintiff employees had meetings with Army officials, where the employees, according to the two government witnesses, acknowledged that the Datalect contract did not grant plaintiff any warranty work. Mr. Demetroulis testified that he attended meetings with Messrs. Karmal and Stavrou, stating that Mr. Karmal "was aware that warranty coverage was not provided under the Datalect contract." Tr. 1029.

Mr. Selken, however, presented contradictory testimony regarding these alleged meetings. While he claims that Mr. Stavrou indicated that he "knew about the warranties" during a meeting with Army employees, he agreed that Mr. Stavrou's statement applied only to equipment still in its initial warranty period when the Datalect contract began. Tr. 1110–11. When pressed further on the topic, Mr. Selken changed his testimony, stating instead that the only issue plaintiff brought up in these meetings was "self-maintenance." Tr. 1115.

The court finds that neither of these witnesses' recovered memory is plausible. Mr. Selken acknowledged that he first "remembered" these meetings after hearing Mr. Demetroulis testify at the trial in November 2002. Tr. 1122. No mention of these meetings appears in *Datalect I* (summary judgment in 1997), *II* (trial in 1998), or *III* (appellate decision in 1999), further casting doubt

on whether these meetings actually occurred. In the event they did occur, Mr. Selken's testimony indicated that plaintiff was interested in obtaining the warranty work attached to computers purchased before the Datalect contract. This work was not "required to be purchased" under the requirements clause, and plaintiff was not entitled to this work. If these meetings did take place, it appears that plaintiff simply was trying to obtain work that was not covered by its contract.

Third, Mr. Demetroulis attempted to draw a distinction between "warranty" repairs and "Tier–III" repairs, arguing that the contract entitled plaintiff only to the latter. This distinction distilled to whether a part was "defective" versus "broken," a distinction the court finds meaningless.

The court finds that the Army breached the requirements clause by improperly extending warranties on equipment it purchased from EDS. The court must evaluate plaintiff's proof of damages resulting from this breach; in doing so, it must determine how many calls were improperly diverted to ACA—the organization subcontracted with EDS to perform the warranty work—and what value to assign to each call.

In his report Mr. Watts opined that, had plaintiff received all of the warranty calls performed by ACA on behalf of EDS, it could have completed "those calls without hiring any additional manpower. Therefore, there would have been no unexpected additional labor costs and there would have been no additional parts costs as the parts would have been under warranty." Watts Rpt. ¶ 10. Mr. Watts estimated that the number of warranty calls performed by ACA during the life of the Datalect contract amounted to 17,291. Watts Rpt. ¶ 11.

Mr. Watts arrived at the 17,291 figure by correlating calls recorded on ACA service sheets with warranty call lists from three Army maintenance desks in the Netherlands. The first of these lists was a compilation of requests for warranty work on Tier–III equipment received by the Wuerzburg Regional Service Center. The cover letter to the list, dated December 28, 1995, stated that

the list began in March 1993 and included "all requests for warranty work on TIER[-]III equipment requested by all organizations covered by the DATALECT contract...." The list chronicled requests for warranty work through October 26, 1995. Attached to the list of warranty requests were "copies of e[-]mail messages received by the Wuerzburg TIER[-]III maintenance desk from 5[th] Signal command, directing what action to take for different warranty equipment[ ] and the list of equipment [for which] that maintenance desk will no longer submit work orders to" plaintiff. These e-mails trace the diversion of warranty work away from plaintiff. For example, on May 19, 1995, Mr. Selken notified the maintenance desk that the "Texas Instrument equipment is being sold by EDS which has a 3[-]year warranty. Please do not call this equipment into [plaintiff] any longer."

The second list of warranty calls on which Mr. Watts relied was obtained from an unidentified maintenance desk and covered warranty work requests from 1994 only. This list contained columns listing the contractor contacted to make the repair and the type of equipment under warranty, its manufacturer, and its model. Mr. Watts used this information to determine if this equipment would be covered under the Datalect contract; aside from "the odd one or two," he determined that "the rest of them were covered ...." Tr. 286.

The third list of warranty calls received from the Kaiserslautern maintenance center is not in evidence. Mr. Watts maintained that he left this list in his office and did not bring it to court.

In performing his warranty damages analysis, Mr. Cotton determined that Mr. Watts's original warranty call estimate contained instances where Mr. Watts double- or triple-counted the same warranty call, and Mr. Watts testified that he had made no effort to ensure that he had not counted the calls on the maintenance center lists more than one time each. However, after receiving Mr. Cotton's analysis, Mr. Watts stated that he adjusted his own report to eliminate any calls that he had counted more than one time. He also compared his monthly totals with those

submitted by Mr. Cotton: If Mr. Cotton arrived at a larger number of warranty calls than Mr. Watts in a given month, Mr. Watts used Mr. Cotton's total, but if Mr. Cotton's total was less than that calculated by Mr. Watts, Mr. Watts used his own figures. This methodology was not conservative.

Mr. Cotton did not use the ACA call lists or the maintenance desk call lists when performing his warranty damages calculation. Instead, he relied on a list tracking the failure rate of equipment obtained under the EDS contract. The court excluded this list because plaintiff received it only while Mr. Cotton was testifying at trial. Because the document upon which he grounded his testimony had been excluded, Mr. Cotton indicated that his damages calculations were less reliable.

Mr. Cotton did supply the court with an analysis that was not tainted by the excluded EDS failure rates. Initially, he deemed the ACA call lists unreliable, as they supplied insufficient information to discern which calls would have fallen under the Datalect contract. After receiving a summary of the ACA call lists prepared by plaintiff's counsel, Mr. Cotton compared the summary to the lists and discovered that some of the calls had been double- or triple-counted. After receiving copies of two of the maintenance desk call lists relied upon by Mr. Watts, Mr. Cotton attempted to determine if any of the calls appearing on the maintenance desk lists also appeared on the ACA call lists. In doing so, he was informed by Walter Klaus, an EDS employee, that more than half of the calls that appeared on the ACA call lists were not attributable to equipment purchased under the EDS contract. Thus, Mr. Cotton adjusted his warranty call estimates to exclude the warranty calls not attached to equipment purchased from EDS, concluding that the actual call count attributable to EDS equipment was 12,495.

In determining the number of calls, the court cannot fully credit either Mr. Watts's or Mr. Cotton's analyses. Mr. Watts initially did not find the duplicated and triplicated warranty calls discovered by Mr. Cotton; moreover, when Mr. Watts integrated Mr. Cotton's assessment of the number of war-

ranty calls into his report, Mr. Watts ignored Mr. Cotton's monthly totals when they were less than his own calculations, yet included them when they supplied plaintiff with more warranty calls than Mr. Watts had calculated. Mr. Cotton disavowed the conclusions presented in his own report, as they were based on the EDS failure rate, a document that the court excluded. However, he did explain to the court that the 12,495–actual–call figure was not based on the EDS failure rate.

While Mr. Cotton viewed the 12,495 figure as containing calls that likely were not allocable to the Datalect contract and ultimately premised his findings on the failure rate, the court finds this figure to be a reliable reference point. Plaintiff is seeking lost profits due to the procurement of extended warranties. In *Ace–Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1332 (Fed.Cir.2000) (*cited with approval in Applied Companies*, 325 F.3d at 1338), the court approved the use of lost profits to measure plaintiff's damages for the Government's improper diversion of work in violation of a requirements contract. "Lost profits are 'a recognized measure of damages where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of profit can be made.'" *California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349 (Fed. Cir.2001) (quoting *Neely v. United States*, 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961)). "'If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.'" *Id.* at 1350 (quoting *Locke v. United States*, 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960)).

The 12,495–call figure must be discounted, as the court credits Mr. Cotton's testimony that some of the calls included within this total are not attributable to the Datalect contract. Moreover, Mr. Bassie, who worked as a field service technician for plaintiff from 1995 until 1997, testified that 20% of his workload was spent on EDS computers and that the majority of these computers were still under warranty. Thus, the 12,495 calls also must be discounted to reflect the fact that plaintiff did receive EDS warranty work, some of which was presumably the result of the Army's negotiation of extended warranties. The figure must be reduced further to reflect calls on machines still within their standard warranty period.

Countervailing factors mitigate against discounting the number of calls too severely. Mr. Watts testified that there are "13 maintenance desks," but, when formulating his warranty damages theory, plaintiff "only got information from three." Tr. 287. Moreover, Mr. Demetroulis testified that there were suppliers of Tier–III equipment other than EDS during the Datalect contract and that the Army purchased equipment with warranties from these other providers. Similarly, Mr. Demetroulis testified that the 8,000 new computers purchased by 5th Signal in 1994 came from "various vendors," Tr. 987, and had attached three-year warranties. Finally, as of June 30, 1992, the Army Contracting Center estimated that were approximately 90,000 Tier–III machines in inventory, and it is reasonable to infer that an indeterminate number of them generated warranty calls during the Datalect contract. Defendant faults plaintiff's proof of the CLIN prices in its proposal, yet plaintiff established that the Army, as of the date of trial, had not produced anything approaching to full records of the warranty calls. Mr. Demetroulis's testimony accounting for missing records was singularly unimpressive.

After considering all of the above factors, the court concludes that an overall discount rate of 40% should apply to Mr. Cotton's call estimate, yielding 7,497 warranty calls to which plaintiff was entitled.

After Mr. Watts determined the number of calls that plaintiff should have performed, he multiplied this amount by DM 178.00, the amount plaintiff allocated to the CLIN for technical inspection calls in its BAFO. Mr. Watts then concluded that the total, DM 3,077,798.00, represents the lost revenue to plaintiff from the diversion of warranty calls. Mr. Watts justified the choice of the technical inspection CLIN because a warranty repair is "a labor[-]only repair." Tr. 215. He reasoned that, because the machinery would

still be under warranty, plaintiff would be supplied parts free of charge, so a CLIN for a labor-only repair was appropriate. The DM 178.00 figure also included a component that covered plaintiff's overhead costs. Had plaintiff been required to supply a part for a warranty repair, it would have charged the CLIN price associated with that type of equipment; the difference between that CLIN price and DM 178.00 would have covered plaintiff's parts costs.

Mr. Cotton disputes that plaintiff could have performed the extra warranty calls without increasing its costs, correctly pointing out that, if plaintiff incurred no increased costs in fielding the warranty calls, then the technical inspection CLIN represents DM 178.00 of profit per call. The court agrees that an addition of 7,497 calls surely would have increased plaintiff's costs to some degree, but, once again, the court cannot credit plaintiff's costs calculation.

In a colloquy with the court, Mr. Cotton indicated that he had determined that plaintiff would incur a net revenue of DM 52.00, minus expenses, on the warranty calls. Mr. Watts testified that his DM 178.00 figure represented the cost of performing a technical inspection plus a 15% profit, and Mr. Cotton agreed that his approach harmonized somewhat with Mr. Watts's. The following exchange underscores the appropriateness of the DM 52.00 figure:

THE COURT: Then how did you come to that 52?

THE WITNESS: That was an aggregate number.

. . . .

THE WITNESS: Aggregate across all the CLINs.

THE COURT: Well, in a damage calculation that's what you do. We don't cost out every single service call. We come up with a methodology that we project. And are you saying that this methodology would not be accurate because we haven't assessed it against the price of 178? Is that your point?

THE WITNESS: No. No, Your Honor. I tried to do the aggregate analysis in my report. The place where this would become an issue is in the contract reformation theory . . . .

Tr. 1899–1900.

Mr. Cotton's DM 52.00 is the appropriate measure of plaintiff's damages for the extended warranties. It avoids Mr. Watts's and Mr. Cotton's flawed warranty damages analyses; moreover, it is reliable as representing a profit forecasted by defendant's expert's analysis. Thus, the court finds that plaintiff is entitled to DM 52.00 per warranty call. Based on 7,497 calls at DM 52.00 per call, plaintiff's damages total DM 389,844.00. Using the conversion rate from 1993 (the year plaintiff submitted its BAFO and began performance) of DM 1.6037 to $1.00,[24] plaintiff's damages convert to $243,090.35.

## CONCLUSION

Plaintiff's proof regarding its negligent estimate damages was not sufficiently reliable for the court to credit either its reformation or its total loss calculation. Plaintiff also did not establish that the requirements clause entitled it to receive calls for equipment still in its initial warranty period. Plaintiff has proved by a preponderance of the evidence that the Army breached the requirements clause by negotiating extended warranties on Tier–III equipment covered by the Datalect contract and that it has suffered damages as a result of that breach. After an almost eight-year litigation effort, plaintiff has demonstrated its entitlement to recover a portion of its claimed damages. Accordingly,

1. By May 2, 2003, the parties shall file a stipulation with the Clerk of the Court as to the date of receipt of Mr. Watts's March 17, 1995 claim letter.

2. The Clerk of the Court shall enter judgment for plaintiff in the amount of $243,090.35, with interest pursuant to the CDA, 41 U.S.C. § 611, from the date recited in the stipulation.

**24.** The Army's Abstract of Final Offers, prepared on January 25, 1993, listed the conversion rate for Deutsche Marks to American dollars as DM 1.6037 to $1.00.

IT IS SO ORDERED.

No costs.